**UNITED STATES of America,**
**Plaintiff,**

v.

**ASSOCIATED MILK PRODUCERS,**
**INC., Defendant.**

**Civ. A. No. 74 CV 80-W 1.**

United States District Court,
W. D. Missouri, W. D.

April 30, 1975.

See also D.C., 380 F.Supp. 880.

Rebecca J. Schneiderman, John C. Danielson, Antitrust Div., Dept. of Justice, Chicago, Ill., for plaintiff.

Sidney Harris, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

### I.

This antitrust case was initially filed on February 1, 1972 in the Western District of Texas as a civil action under circumstances stated in the affidavit filed January 3, 1974 by the Honorable Richard W. McLaren, presently a United States District Judge, who at the time this case was filed, was the Assistant Attorney General of the United States in charge of the Antitrust Division of the Department of Justice. Pretrial proceedings in this case were, through the cooperation of the Honorable Dorwin W. Suttle, Judge of the Western District of Texas, conducted from the outset by this Court and coordinated with the group of earlier filed private antitrust treble-damage cases which eventually were transferred to this Court pursuant to 28 U.S.C. § 1407 as the Midwest Milk Monopolization Litigation, JPML Docket No. 83.

This case was formally transferred to this Court on February 20, 1974, pursuant to 28 U.S.C. § 1404(a) and was given a priority designation, together with several of the private cases originally filed in the Southern District of Texas for early trial. Various pretrial orders anticipated that trial of this case would have commenced in January, 1975.

On August 13, 1974, the parties filed a stipulation under which a proposed consent decree was presented to this Court for approval. Procedures directed by the Court and followed by the parties in connection with the proposed consent decree, the complexity of that proposed decree, the passage and approval of the Antitrust Procedures and Penalties Act, P.L. 93–528, 88 Stat. 1706; U. S.Code Congressional and Administrative News, 93rd Cong., 2nd Sess., p. 1962, on December 21, 1974, and a recent grand jury investigation of AMPI in the Western District of Texas, have all delayed the processing of the proposed consent decree.

The details of those events and the procedures followed by this Court will be stated in the next part of this opinion. We find and conclude that the procedures directed before and after the approval of the Antitrust Procedures and Penalties Act reflect a substantial compliance with the provision of that new legislation; that various motions to intervene should be denied; that the proposed consent decree as the same has been amended during the processing of this proceeding should be approved; and that a supplemental order establishing enforcement and modification procedures should be entered by this Court on its own motion.

### II.

The proposed decree was presented under a stipulation which provided that the parties consented that a Final Judgment be entered in the form attached to the stipulation after the expiration of sixty days without further notice to any party or other proceedings, provided the government had not withdrawn its consent within the sixty day period. The press release reproduced in the footnote was issued the same day by the Department of Justice in Washington.[1] The

1. The press release stated in its entirety:
FOR IMMEDIATE RELEASE
TUESDAY, AUGUST 13, 1974
The Department of Justice filed a proposed consent decree today that would terminate a

civil antitrust suit against the nation's largest milk cooperative, Associated Milk Producers, Inc., (AMPI) of San Antonio, Texas.
Attorney General William B. Saxbe said the proposed judgment, which will become final

procedures followed purported to be in compliance with 28 C.F.R. § 50.1(b), except the Assistant Attorney General in charge of the Antitrust Division stated in the press release that "the usual 30-day waiting period was doubled because of the complexity of the decree and the large numbers of interested parties." No supporting data whatsoever was presented to support the conclusory statements of the press release in regard to the scope and effect of the proposed consent decree.

The transcript of the proceedings for September 3, 1974, shows that this Court indicated its dissatisfaction with the manner in which the proposed consent decree had been presented. Extensive reference was made to the Hearings conducted on S. 782 before the Subcommittee of the Senate Judiciary Committee. We made clear in September, 1974 that this Court would insist upon "procedures consistent with full illumination in an orderly manner so that the charge cannot be legitimately made that any consent decree in this case is somehow a dividend, last dividend perhaps, to have been received in light of political contributions which the parties like to talk about in this case." [Ibid, p. 28]

We directed at that conference a "reappraisal on the part of the government and AMPI and a suggested time schedule where an explanation of what this decree means and an explanation of what it does not mean may be promptly filed where persons who may object, once they find out what the decree is designed to do and what it is designed not to do will be afforded an appropriate opportunity to state in writing their objection, if any, or their suggestion for clarification which they may deem appropriate under the circumstances." [Ibid, pp. 28–29]

After full discussion of the problems presented, and after an off-the-record recess, the Court established a timetable and schedule for the various procedural steps to be taken before this Court would determine whether or not the proposed consent decree would be approved.[2] The matter was set for further hearing for November 6, 1974, in order that the various filings contemplated by the directions made at the September 3, 1974 hearing could be given appropriate consideration.[3]

---

in 60 days upon approval by the Court, was filed in U.S. District Court in Kansas City, Missouri.

AMPI has about 37,000 farmer members in 14 states—Arkansas, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Nebraska, New Mexico, Oklahoma, South Dakota, Tennessee, Texas and Wisconsin.

The suit filed February 1, 1972 charged AMPI with conspiracy to restrain and attempt to monopolize trade in the production and the sale of milk.

Assistant Attorney General Thomas E. Kauper, in charge of the Antitrust Division, said the complaint alleged that the AMPI had engaged in activities designed to coerce farmers to join the cooperative.

These included actions intended to depress prices paid to non-members and to foreclose markets to them, he said.

All of the anticompetitive activities identified in the complaint are enjoined by the proposed decree.

The relief contained in the judgment will insure that non-members—and former members—have the opportunity to market milk in free and open competition with the AMPI and will effectively prevent AMPI from coercing non-members to join, Mr. Kauper said.

Comments to the Department of Justice and the Court regarding the proposed judgment are invited from members of the public, during the 60 day waiting period prior to the judgment becoming final.

Mr. Kauper said the usual 30-day waiting period was doubled because of the complexity of the decree and the large number of interested parties.

2. Those steps are set forth, together with detailed explanations, on pages 71 to 102 of the transcript of proceedings of September 3, 1974.

3. Our memorandum and order of October 3, 1974 modified the time schedule pursuant to a joint request from the government and AMPI under which the time for filing the initial government-AMPI response was extended until October 10, 1974. The time for third persons to file formal objections and other appropriate pleadings, together with legal briefs on the scope of the Court's power to review the pro-

Consistent with the schedule, as amended, the government on October 11, 1974 filed a 99 page response to all comments which had been earlier filed by various third persons relating to the proposed consent decree. Eight of the numerous parties to JPML Docket No. 83 had earlier made filings in which they made both general and specific comments on the proposed consent decree. In addition, seven persons not parties to JPML Docket No. 83 had earlier filed comments in accordance with established time schedules.

The government's detailed response treated specifically all issues raised by all persons as they related to the various provisions in the proposed consent decree. That response stated in detail the reasons why the government concluded that the litigation should be terminated in accordance with the proposed consent decree.

The table of contents to the government's response, attached hereto as Appendix A, reveals the scope and careful detail of that response and affords the factual basis for our finding and legal conclusion that such response, when considered in light of all other filings in this case, reflects an adequate compliance with the subsequently enacted provisions of the Antitrust Procedures and Penalties Act, as provided in § 2(b), requiring the filing of a competitive impact statement; and § 2(c), requiring a summary of the terms of the proposal for the consent judgment, and as an appropriate response to comments made by interested third persons, as presently required by § 2(d).[4]

Prior to the hearing on November 14, 1974, and in addition to objections and suggestions in regard to the proposed consent decree, formal motions to intervene were filed by NFO; Schepps Dairy, Inc., and Sentry Foods States. The government filed suggestions in opposition to the motions to intervene the day before the November 14, 1974 hearing.

The transcript of the proceedings held November 14 and 15, 1974, shows that the Court deferred ruling on the motions to intervene and directed proceedings to determine whether it was either necessary or appropriate to hear the live testimony of any particular witness which any person wished to call. At the close of the second day of the November 14, 1974 hearing, the Court granted all persons an opportunity to prepare, serve, and file an appropriate statement which would outline the testimonial evidence which they believed should be adduced, together with a summary statement of the testimony that would be elicited from that witness. The Court also required that the statement include an identification of any documentary evidence which counsel believed the Court should consider before ruling the question of whether the proposed consent decree should be approved. [See page 141 of the transcript of proceedings of November 14, 1974 hearing.]

NFO, Schepps Dairy, Inc., ARSCP and NAMR filed timely statements of evidence which they believed should be adduced by the Court considering the proposed consent decree. We have carefully considered those statements and find and conclude that the data which all parties wished to introduce in evidence was either uncontroverted or clearly irrelevant and immaterial to any issue before the Court. NFO's statement of

---

posed consent decree was extended until October 28, 1974; the time for the government-AMPI response to third party objections and pleadings was extended until November 11, 1974; and the hearing, initially set for November 4, 1974, was continued until November 14, 1974.

4. AMPI filed a response on October 17, 1974. No particular attention need be focused on the

AMPI response. For AMPI made clear at the November 14, 1974 hearing that its response was written simply for the purpose of supplying supplemental information and was not intended to contradict or to take issue with anything stated in the government's response (see page 104 of the transcript of November 14, 1974 proceeding.)

evidence, for example, focused upon NFO's concern about the provisions of the proposed consent decree as it related to membership agreements relief afforded an AMPI member; other alleged deficiencies in the proposed consent decree which had been earlier stated on pages 9–14 of NFO's earlier filed objections; NFO's contention that the Final Report of the Senate Watergate Committee required a "plenary evidentiary hearing amounting to a full trial;" that the decree should contain appropriate provisions which would require divestiture relief; relief against harassing litigation, and relief against political slush funds which would enjoin AMPI from operating or controlling TAPE, C–TAPE, or their progeny.

█ NFO's statement of evidence identified particular depositions and documents already available for the Court's consideration. We also already had available for consideration the Final Report of the Senate Watergate Committee, the Wright report and exhibits relating to that report, which had been produced by Mr. Wright at his deposition. We are satisfied that we have much more data before us for consideration than that contemplated by the Antitrust Procedures and Penalties Act. We find and conclude that a plenary evidentiary hearing is neither necessary nor appropriate under the circumstances.[5]

The Court required the government to give all interested persons the names of the economists who had worked for the government in connection with this case. The government's letter to all liaison counsel in JPML Docket No. 83 shows that the Assistant Attorney General in charge of the Antitrust Division had, at this Court's request authorized the release of an economic analysis of AMPI which had been prepared for the Department of Justice by Dr. Robert T. Masson, Philip Eisenstat, and David Roddy. That analysis is literally three inches thick and was made available to anyone who wished to see a copy. It has, of course, been carefully reviewed by this Court.

### III.

This Court commenced what it anticipated would be its final study of the massive data produced pursuant to the procedures above outlined during the first week of December, 1974. Shortly after December 9, 1974, however, we received copies of the Congressional Record which reflected the unanticipated legislative procedures which resulted in the early enactment of S.B. 782 on December 17, 1974. We promptly addressed a letter to counsel for the government and counsel for AMPI, with copies to all persons who had indicated an interest in the proposed consent decree, requesting their views in regard to whether, assuming Presidential approval, the enactment of the Antitrust Procedures and Penalties Act could be said to be retrospectively applicable to the extent of nullifying all of the procedural steps theretofore taken in regard to the proposed consent decree. We directed attention to the general presumption that a newly enacted law should be construed to operate prospectively, as stated in Hassett v. Welch, 303 U.S. 303, 314, 58 S.Ct. 559, 82 L.Ed. 858 (1938), but recognized that the general rule was not without exceptions, particularly in regard to a statute regulating procedures. We suggested that the question be squarely faced and determined that further action in regard to the proposed consent decree be deferred until such question was resolved.

---

5. Section 2(f) of the Antitrust Procedures and Penalties Act, in our judgment, merely codified the existing discretionary power of a court to take such testimony as it may deem necessary and to authorize full or limited participation in proceedings before the Court in a manner which would serve the public interest as the Court may deem appropriate.

In the exercise of discretion recognized in § 2(f), we find and conclude that to direct further proceedings in order to obtain the benefit of further comment by any interested person, including but not limited to directing further plenary hearings, would not be either appropriate or in the public interest under the circumstances of this case.

On January 17, 1975, the government, in principal reliance upon Bradley v. School Board of the City of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L. Ed.2d 476 (1973), stated its view that the Antitrust Procedures and Penalties Act applied only to the extent necessary to carry out the policies of the new Act and that further directions under the circumstances of this case needed to be considered only to the extent that the new Act imposed significant new duties. The government suggested, and we agree, that the aims and objectives of §§ 2(b), 2(c) and 2(d) were adequately fulfilled by the procedures initially directed and that republication and refiling of various documents under the rubric of a "Competitive Impact Statement" would serve no useful purpose. The government suggested, and we agree, that the new requirements of § 2 (g) must be satisfied. For that was the only requirement which this Court did not anticipate before the enactment of the new legislation.

On January 23, 1975 AMPI filed a memorandum in which it stated its views that the proposed consent decree was not in any way subject to the Antitrust Procedures and Penalties Act. AMPI, however, stated that it had no objection to filing a statement of contacts with government officials made on behalf of AMPI in regard to the pending proposed consent decree. Counsel for AMPI were directed on January 29, 1975 to prepare, serve, and file a § 2(g) statement.

On February 21, 1975 AMPI, without waiver of its previously stated position that the new Act does not apply to the proposed consent decree before this Court, filed its initial statement of contacts designed to comply with the requirements of § 2(g).[6] Counsel for NFO wrote the Court a letter on March 6, 1975 in which it contended that the AM-PI statement did not comply with § 2(g). NFO suggested in that letter that "AMPI's efforts to negotiate a consent decree in this case have been continuing since the case was filed." NFO cited various pages of the June, 1974 Final Report of the Senate Watergate Committee to direct attention to political contacts which AMPI had had with the White House, the Justice Department and the Secretary of the Treasury as they related particularly to Section VI of that Report, entitled "Milk Producer Contribution Activity in 1972 prior to April 7, 1972, the Justice Department Antitrust Suit Against AMPI" and Section VIII of that Report relating to "Milk Producers Contributions to the President's Campaign After April 7, 1972," as those sections appeared on pages 699 through 743 of the Final Report.

It is appropriate to note that the series of letters written by counsel for NFO in regard to AMPI's Section 2(g) statement do not represent the first attempt on NFO's part to incorporate the Senate Watergate Committee's Final Report as a part of the record in this consent decree proceeding. NFO earlier wanted this Court to use the Watergate data for a different purpose; namely, to support its pending motion to intervene. NFO's rationale supporting the attempted use of the Watergate data is basically the same in both instances.

We therefore state the circumstances under which NFO first argued that the Final Report of the Senate Watergate Committee should be considered as relevant and material evidence in this consent decree proceeding. The transcript of the proceedings November 14, 1974 establishes that in order to ascertain the positions of the movants for intervention, the Court directed particular attention to page 9 of NFO's suggestions in support of its motion to intervene which

---

6. On January 25, 1975, AMPI filed a detailed memorandum of law in which it argued that the new Act, including but not limited to § 2(g), should not be given any retrospective effect. We need not reach that question because we believe that under the procedures we have directed, there has been adequate compliance with Section 2(g) under the circumstances of this case.

stated "We want to make it clear that we are in no way questioning the integrity of government counsel in this case, or their motives in presenting this decree for approval." [Ibid, p. 7] Page 18 of that transcript shows that the Court directed a specific question to counsel for NFO and to counsel for Sentry (another movant for intervention) for the purpose of finding out "if the government has correctly concluded from what both of you have said that there is no claim of bad faith or malfeasance within the meaning suggested in *Sam Fox Publishing Co.*, to support intervention under Rule 24?"

Counsel for NFO assured the Court that the government had accurately quoted NFO's suggestions and stated that the comment "was specifically directed to Mrs. Schneiderman, to the people in the Chicago office, and the people within the Antitrust Division whom I know." NFO's counsel, of course, added that this comment was not intended to reflect a view that "the Government in its entirety and in those reaches of the Government inaccessible to counsel who represent it here have not made a deal."[7]

In light of the somewhat ambiguous answer it received from NFO's counsel, the Court granted an immediate recess in order to afford NFO an opportunity to outline in writing what evidence it would adduce if afforded an opportunity at a plenary evidentiary hearing.[8]

After the recess, counsel for NFO read the following statement into the record:

NFO is not charging crime or filing a complaint against the United States with respect to the Consent Decree, but is simply moving for intervention. In this connection, we would adduce the evidence developed by the Senate Watergate Committee and reflected in its final report, filed herewith as NFO's Exhibit A, and made a part hereof. We particularly call the Court's attention to the evidence with respect to the Milk Fund, pages 579 and following. This evidence, together with other material already of record in this case, constitutes, in NFO's view, a sufficient showing of corrupting influence at work on the Department of Justice and the Executive Branch in general with respect to AMPI's violations of the antitrust laws to warrant and indeed require allowance of such intervention under the exceptional case doctrine (*Cascade,* 386 U.S. 129), the malfeasance doctrine (*Sam Fox,* 366 U.S. 683), and the Caesar's wife doctrine of the *First National Bank of Lexington, Kentucky* case (280 F.Supp. 260, 263).

The witnesses and evidence which NFO would adduce as intervenors are:

1. Those named witnesses whose testimony is relied upon and reflected in the Final Report (Exhibit A hereto).

2. The testimony of Richard M. Nixon.

3. The official files of the Executive Branch relating to this matter (including Presidential files and tapes).

NFO also requests leave to supplement this list if intervention be granted. [Ibid, pp. 30–31]

---

7. Counsel for Sentry, in response to the same question, advised the Court that "we have no evidence whatsoever that would lead us to believe that there is any corruption at work in the formulation of this settlement."

8. We stated the following on page 27 of the transcript of November 14, 1974:

I am simply going to require during the recess that NFO, which is the only party that believes the record is not fully established to make any argument, to put down on a written list in long hand precisely who they would call to prove that the parties representing the United States in connection with the negotiation of this Consent Decree may properly be found as a matter of fact and under applicable law to have violated not only their duties as officers of the United States but their duties as officers of this Court, and that they are guilty of bad faith and malfeasance in the discharge of those duties. [Ibid., pp. 27–28]

Counsel for NFO then suggested that further proceedings with respect to the motions to intervene be deferred until a later stage of the hearing "in the hope that progress might be made toward working out a decree more, in the NFO view, in the public interest than the present proposal." [Ibid, p. 31] We indicated that we would take judicial notice of the Final Report of the Senate Watergate Committee and deferred ruling on the motions.

It is thus clear that NFO's attempted reliance upon the Final Report of the Senate Watergate Committee, and its effort to have that Final Report made a part of the record in this proceeding, was first suggested to support NFO's motion to intervene. NFO's letter of March 6, 1975 in which it cited particular portions of the Final Report as a basis for objecting to AMPI's original Section 2(g) statement was but an amplification of NFO's earlier reliance on the Watergate data at the November 14, 1974 hearing. NFO's March 6, 1975 letter simply reiterated its earlier position by quoting specific pages of the Senate Watergate Committee's Final Report which obviously reflect a great deal of lobbying and political activity on behalf of AMPI which the Senate Watergate Committee believed to support the adverse findings made by that Committee. The general thrust of NFO's repeated argument is that those Congressional findings establish as a matter of fact that AMPS did in fact exercise a corrupting influence on particular officers of the United States. NFO takes the general position that this Court should draw an inference from the conclusions stated by the Senate Watergate Committee that representatives of the Antitrust Division of the Department of Justice may somehow have also been corrupted by AMPI's general lobbying activities. In short, NFO argues that the Final Report of the Senate Watergate Committee produced sufficient smoke to warrant and require this Court to reject AMPI's Section 2(g) filings and to grant NFO's motion to intervene

in order that NFO be permitted, in a prosecutorial role, to conduct an evidentiary hearing under the circumstances.

■ We read the Senate Watergate Committee's Final Report and all other data which has been brought to our attention in the same manner that counsel for Sentry read that data. We find and conclude that we may not properly draw the inference which NFO would have this Court draw from the Watergate Committee's Final Report and other data. That data, in our judgment, does not support NFO's suggestion that corruption was at work in the formulation of the consent decree proposed in this case.

We have deemed it appropriate to deal with this particular matter in some detail and have treated NFO's letters to the Court in the same manner as if NFO had filed appropriate motions under the Rules requesting specific relief because we recognize the danger that confidence in the present administration of the Antitrust Division of the Department of Justice and confidence in the administration of justice in the courts of the United States as it relates particularly to the antitrust laws could be impaired by fragmentary newspaper reporting which could erroneously lead to the erroneous impression that approval of the proposed consent decree in this case somehow resulted from procedures which failed to permit still another investigation of AMPI's lobbying activities.

In order that the emotional impact of the cry "Watergate" be subjected to factual scrutiny, we requested both AMPI and the government to amplify the § 2(g) information initially submitted by AMPI in order that the record would reflect any and all contacts which may have been made in connection with earlier unsuccessful attempts to negotiate a specific consent decree in this case. The government complied in its letter to the Court dated March 28, 1975. AMPI amplified its original § 2(b) statement in its letter to the Court dated April 9, 1975.

Counsel for NFO registered dissatisfaction with the government's statement in a letter to the Court dated April 4, 1975. That letter reiterated NFO's legal contention that § 2(b) "requires the defendant to disclose *all* lobbying contacts, irrespective of whether they culminated in recognized effects at the staff level of the Antitrust Division." Counsel for NFO attached a copy of a letter written April 4, 1975 to Thomas E. Kauper, Assistant Attorney General in charge of the Antitrust Division, in which NFO requested a statement of the Antitrust Division's position with respect to enforcing the lobbying disclosure required by § 2(g). Consistent with its basic position both in connection with its expansive reading of § 2(g) and its argument in support of its motion to intervene, NFO contended that:

> The Senate Watergate Committee's Final Report shows that AMPI's lobbying contacts in this case have been intensive and gross, dating back long prior to February 1, 1971, when it was finally filed as a civil proceeding, and continuing at least until October, 1972. None of them which is reflected

in that Report appears in the AMPI filing.

NFO stated its view that "AMPI's efforts which effectively subverted the criminal prosecution of AMPI recommended by the trial staff fall within the scope of the disclosure required by § 2(g) of the Act." [9] After referring to AMPI's alleged failure to include "highly significant post-February 1, 1971 lobbying efforts in its § 2(g) statement and Certificate" and after referring to lobbying contacts made after that date as documented in the Senate Watergate Committee's Final Report, NFO argued that "if § 2(g) . . . means anything, it requires a comprehensive reporting by AMPI of the above listed matters."

The Court received a copy of Ms. Schneiderman's letter of April 18, 1975 written to NFO counsel on behalf of Assistant Attorney General Kauper in response to NFO's letter of April 4, 1975. That letter advised the Court that the government did not consider either of AMPI's § 2(g) statements to be deceptive or misleading. The government properly suggested that, in the final analysis, the determination of whether

---

9. An example of how NFO would incorporate the Senate Watergate Committee's Final Report into this case is illustrated by the following reference to that Report contained in its April 4, 1975 letter to Assistant Attorney General Kauper:

> We know that "resolution of antitrust problems" was a "subject of some discussion" between the milk producers and the White House in 1970 and 1971. "Jack Gleason [in 1969 and 1970 assistant to White House official Harry Dent] says he remembers meeting with [AMPI officials] Nelson and Parr in early 1970 and discussing their concern over possible trouble from the Justice Department." (Senate Watergate Committee Final Report, page 705.) Indeed, during the period that Attorney General Mitchell had under consideration the Antitrust Division's request to conduct grand jury proceedings against AMPI, Attorney General Mitchell apparently talked about the matter with President Nixon's fiscal aide, Mr. Kalmbach—who had earlier received $100,000 in cash in a black bag from AMPI—and with AMPI Washington counsel, Murray Chotiner. At this time

Mr. Chotiner also met with Mr. Haldeman, then White House Chief of Staff. On November 4, 1971, a White House political matters meeting was held whereat Messrs. Haldeman and Mitchell discussed the Justice Department's pending antitrust investigation and in that connection "milk money." Documentary evidence of the meeting "clearly suggests that the Attorney General was informed of the connection between the milk producers under investigation and 'milk money' and that Haldeman and the Attorney General discussed the investigation in the context of the campaign and milk producer contributions." (Final Report, page 707)

On November 30, 1971, in a departure, according to [Assistant Attorney General] McLaren, from Department practice, Attorney General Mitchell rejected the request for a grand jury investigation of AMPI. In a one-line memorandum, he instructed McLaren, 'per our conversation, I request that you go the civil route,' thereby limiting the case to a civil suit only. (Final Report, page 701).

AMPI has satisfied the substance of the requirements of § 2(g) was a matter for this Court's determination.

NFO did not respond to the government's statement until April 25, 1975. On that date NFO's counsel wrote this Court a letter in which it reiterated that it was not satisfied with the procedures which had been directed and suggested that the public interest would not be properly protected unless NFO was authorized to intervene in the present proceeding and, in effect, be authorized to adopt the prosecutorial role which NFO contends has been dropped by the government.

We do not believe and do not determine that AMPI's § 2(g) filings are, or will in the future, be considered as a model to be used for future cases. We nevertheless are convinced that under the circumstances of this case the various political activities and lobbying contacts by AMPI cited by NFO from the Senate Watergate Committee's Final Report were reasonably apparent from the pretrial discovery conducted in this case long before AMPI was required to file either its original § 2(g) statement or its later amplified § 2(g) statement.

The fundamental defect in NFO's position demanding still further AMPI investigation is reflected by its consistent insistence that *all* political activities and *all* lobbying contacts are within the coverage of § 2(g).

■ In light of the statements made to this Court at the November 14, 1974 hearing, and in light of NFO's subsequent failure to indicate with any degree of particularity as to whether or not NFO had any claim or evidence which could reasonably be said to suggest that anyone connected with the Antitrust Division had been corrupted by any of AMPI's Watergate activities, we refuse to accept NFO's implicit argument that "where there is smoke, there must be fire." We find and conclude that an insufficient showing has been made by NFO to support the necessity for rejection of AMPI's Section 2(g)

filings or to direct any further evidentiary hearing to inquire into whether the proposed consent decree was the result of either bad faith or malfeasance on the part of the representatives of the United States who in fact negotiated and proposed the consent decree in its proposed form.

■ We are confident that so far as the personnel of the Antitrust Division of the Department of Justice involved in the actual negotiation of the pending proposed consent decree are concerned, all such persons were uninfluenced by outside political pressure and that the proposed consent decree was in fact negotiated in good faith and without malfeasance on the part of the representatives of the United States who in fact negotiated and proposed the consent decree. We so find.

For the reasons stated, we find and conclude that the procedures directed by this Court in connection with § 2(g), assuming that said section is retrospectively applicable, have adequately complied with that section and that no additional procedures, including evidentiary hearing, are necessary or appropriate under the circumstances.

## IV.

During the course of the proceedings we advised counsel for the government and for AMPI that the proposed consent decree would not be approved unless the provisions of Paragraphs IX and V were modified. Accordingly, on February 24, 1975 consistent with the Court's indicated concern in regard to the language of those provisions, counsel for the government and AMPI presented an agreed order making substantial modification of both those paragraphs consistent with the views stated to counsel by this Court. An additional agreed order was presented the Court on March 6, 1975 which made clear that any and all separate regional or sectional cooperatives which might be created by any reorganization or restructuring of AMPI would be bound by any final judgment entered in this case.

Definitive action on the proposed consent decree was delayed by the commencement of a grand jury investigation instituted by the government in the Western District of Texas. The Court was advised in late February, 1975 that AMPI was giving consideration to attempting to withdraw from the proposed consent decree. It was not until March 18, 1975 that the Court was advised that AMPI was satisfied with the responses it had received from the government in regard to the scope of the grand jury investigation being conducted in the Western District of Texas at San Antonio. This Court, however, was not in a position to give final consideration to the proposed decree and the pending motions to intervene until AMPI's expanded Section 2(g) statement was filed April 9, 1975 and until it had received and considered NFO's most recent response to that filing.

In the next part of this opinion we shall state the reasons why the pending motions to intervene will be denied. We shall then state the reasons why the proposed consent decree, as modified by the agreed orders above described should be approved. In the last part of this opinion we state the reasons why we believe it is appropriate that on our motion we enter a supplemental order which will establish enforcement and modification procedures in regard to the approved consent decree.

## V.

Section 2(f)(3) of the Antitrust Procedures and Penalties Act codified existing law when it provided that the Court shall have discretionary power to authorize "full or limited participation in the proceedings before the court." While the words "full or limited participation" are not defined in the Act, we believe it clear that the Congress recognized that under existing law, the court could, in the exercise of its discretion, permit "full participation" of an interested person by granting such a person the status of a party pursuant to a motion to intervene authorized by Rule 24 of the Rules of Civil Procedure. "Limited participation," on the other hand, contemplated the recognition of such a person by permitting his appearance as amicus curiae. Indeed, Section 2(f)(3) recognized the great flexibility of equity jurisprudence by providing that the court could authorize an interested person's participation in the proceeding "in any other manner and extent which serves the public interest as the court may deem appropriate."

Whether "limited participation" is to be permitted by way of amicus curiae appearance or whether "full participation" is to be permitted by the granting of an interested person's Rule 24 motion to intervene must be determined in light of the circumstances of a particular case and in light of the scope of judicial power and discretion which may be properly exercised in regard to the approval or rejection of a proposed consent decree.

We are convinced that lower federal courts must follow the guidance of the dictum of Sam Fox Publishing Co. v. United States, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961) and thus "decline appellants' invitation to assess the wisdom of the Government's judgment in negotiating and accepting the . . . consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." We do not believe that *Sam Fox Publishing Co.* was overruled by Cascade Natural Gas Corp. v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967). We are equally convinced that Swift & Co. v. United States, 276 U.S. 311, 331–32, 48 S.Ct. 311, 317, 72 L.Ed. 587 (1928), still states the applicable standard in regard to the broad scope of the Attorney General's discretion, i. e., "His authority to make determinations includes the power to make erroneous decisions as well as correct ones."

The Supreme Court recently handed down one of its relatively infrequent decisions relating to consent decrees when it decided United States v. ITT

Continental Baking Co., 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148, 1975, but not yet officially reported.[10] Mr. Justice Stewart, joined by the Chief Justice, Mr. Justice Powell and Mr. Justice Rehnquist, cited a Note entitled "ITT DIVIDEND: Reform of Department of Justice Consent Decree Procedures," 73 Col. L.Rev 594 (1973), in the course of his dissenting opinion for the purpose of directing attention to the fact that 70 to 80% of all antitrust complaints filed by the Department of Justice terminate in consent decrees. We believe that the Columbia Law Review Note is valuable for other purposes. That Note directed attention to the fact that "For well over three decades, knowledgeable observers have criticized the process by which the Antitrust Division of the Department of Justice negotiates and settles antitrust cases by way of consent decrees." [Ibid, p. 594]

■ We believe that it can fairly be said that this Court recognized from the outset of the pending proceeding that much of the criticism directed at the procedures relating to consent decrees was legitimate and that discretionary judicial power should be exercised to direct procedures which would meet such criticism.[11]

We believe that the Note accurately stated the nature of criticism which, in our judgment, had been properly directed against consent decree procedures:

Criticism of consent decree procedures focuses on the failure of the Justice Department and the courts to give substantial consideration to the views of third parties, the secrecy of the negotiation process itself, and the minimal judicial scrutiny of the proposed decree. These weaknesses are said to have an adverse effect on the public at large, which expects to be protected by adequate enforcement of the antitrust laws, and on private treble damage claimants in particular, who have found it essentially impossible to intervene in a decree proceeding to protect their interest and make their views known. [Ibid, p. 597]

■ Courts, of course, cannot do anything about "the secrecy of the negotiation process itself." Indeed, a court's power to do very much about the terms of a particular decree, even after it has given the decree maximum, rather than minimum, judicial scrutiny, is a decidedly limited power. See United States v. Ward Baking Co., 376 U.S. 327, 84 S.Ct. 763, 11 L.Ed.2d 743 (1964). Power to reform the procedures under which consent decrees are actually negotiated is vested in the executive and legislative branches, not the judicial. And, if the Congress wants the judicial branch to have more power than that implicit in a threat of total rejection of a proposed decree, such power must be authorized by legislation which is considerably broader in scope than that vested by the newly enacted Antitrust Procedures and Penalties Act or by existing law.

Courts have long had power, however, as the procedures directed in this case demonstrate, to devise and direct appropriate procedures to enable the Department of Justice and the court to have the

---

10. *ITT Continental Baking Co.* dealt with an application of the "four corners" rule of United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). The Court concluded that the gloss of *Armour*, read together with what had been said in United States v. Atlantic Refining Co., 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959) and Hughes v. United States, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952), requires that appropriate recognition be given the fact that "consent decrees are normally compromises in which the parties give up something

they might have won in litigation and waive their rights to litigation." [Slip opinion, p. 11]

11. We agree, of course, with the statement in the Note that "Most of the procedural devices contained in the Tunney bill have long been available to the courts to investigate decrees" and that "the specific guidelines for judicial investigation [now incorporated in the Antitrust Procedures and Penalties Act], all discretionary with the court, are hardly revolutionary."

benefit of the views of third parties. Courts which accept Brandeis' idea that "[s]unlight is said to be the best of disinfectants," L. Brandeis, *Other People's Money*, 92 (1914 ed.), have exercised that power under the circumstances of a particular case. That objective may be effectively attained by procedures which do not include the complications which may result from the granting of a formal motion to intervene as a party.

The text of the Note accompanying Notes 159–211 cites the familiar cases which reflect the reluctance of courts to grant more than limited participation of interested persons by way of amicus curiae appearance. Neither the Tunney bill nor the Bayh bill even proposed to change existing law in regard to third party participation. At page 629 of 73 Col.L.Rev. it is accurately stated that "The basic policy question in third party participation in consent decree proceedings is whether such participation is best secured by liberalized intervention. Both proposed bills answer the question in the negative, implying that adequate participation is assured by improved comment periods and greater judicial activism without necessitating procedural entanglements that liberalized intervention might well entail." [Ibid, p. 629]

 Cases such as United States v. International Telephone & Tel. Co., 349 F.Supp. 22 (D.Conn.1972), aff'd. sub nom. Nader et al. v. United States, et al., 410 U.S. 919, 93 S.Ct. 1363, 35 L.Ed.2d 582, make clear that none of the persons who seek to intervene in this case have sufficient standing to intervene as a matter of right under Rule 24(a)(2).[12] Whether permissive intervention should be granted under Rule 24(b) is a matter of discretion. Whether discretion should be exercised favorably must be determined in accordance with the circumstances of this particular case.

Under the procedures directed and followed in connection with the proposed consent decree in this case, this Court has already had the benefit of the view and comments of all persons who have filed motions to intervene. Certainly, all such persons have been permitted to express their views and to make specific and particularized comment on each paragraph of the proposed consent decree. The filings of the government establish that it has given appropriate consideration to those comments and has stated the reasons why some were accepted and most were rejected. Neither the government nor this Court would obtain any more information or benefit from granting any person the status of an intervenor. (See pages 11, et seq. of the transcript of November 14, 1974 for a full statement of how this Court treated the status of an amicus curiae appearance).

 We recognize that this Court must give appropriate consideration to the impact of a consent judgment upon the private antitrust plaintiffs in JMPL Docket No. 83. But appropriate consideration of that factor does not require that any private plaintiff be granted the status of a full party in this proceeding.[13]

---

12. See also United States v. Automobile Manufacturers Association, (C.D.Calif.1969) 307 F.Supp. 617, aff'd per curiam sub nom. City of New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970); United States v. Paramount Pictures, 333 F.Supp. 1100 (S.D.N.Y.1970), aff'd per curiam sub nom. Syufy Enterprises v. United States, 404 U.S. 802, 92 S.Ct. 79, 30 L.Ed. 2d 37 (1971); United States v. Blue Chip Stamp Co., 272 F.Supp. 432 (C.D.Cal.1967), aff'd per curiam sub nom. Thrifty Shoppers Scrip Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 781 (1968); United States v. CIBA Corp., 50 F.R.D. 507 (S.D. N.Y.1970); United States v. National Bank and Trust Company, 319 F.Supp. 930 (E.D. Pa.1970).

13. Nor does any particular private plaintiff have any more standing than any other private plaintiff to claim that its view of the proposed consent decree reflects the public interest. It is obvious that the various plaintiffs in JMPL Docket No. 83 take different views of what the public interest requires.

For example, NFO and the other movants for intervention contend that the public interest requires rejection of the proposed consent decree. On the other hand, the Court was advised in a letter dated April 18, 1975 from counsel for the private plaintiffs in the cases

Nor do we believe that the question of whether a private party should be granted full, rather than limited, participation in a consent decree proceeding should turn on whether the private party would or would not have a right of appeal from a final judgment approving the proposed consent decree over his objection. This view was expressed by then Assistant Attorney General Donald F. Turner, who stated in a letter to Rep. Emanuel Celler that:

> The very process of formal intervention, if that is held to carry with it the full rights of the usual litigant to present evidence and to appeal, would threaten to eliminate one of the major motivating factors that leads both the Government and the defendants to attempt to work out an appropriate decree, since intervention would force on the Government and defendants at least some of the burdens of litigation that both, for diverse reasons, have sought to avoid. [39 Univ. of Chicago L.Rev. Fall 1971 [p. 151][14]

We may assume that it is quite likely one or more of the movants for intervention, should their motions be granted, would pursue an appeal from our order approving the proposed consent decree. But our denial of the various motions to intervene would not foreclose the possibility of that obviously complicating circumstance. For the movants have the right in any event to seek appropriate appellate review of our action denying their respective motions to intervene. We accordingly expressly state that our denial of the pending motions to intervene is not based upon the notion that the processing of JMPL Docket No. 83 would be made less complicated by a denial, rather than a grant, of the pending motions to intervene.

■ Because we are convinced that all interested persons have been afforded every right to fully and fairly state their views and comments which formal intervention would have granted, and because we are convinced that the granting of the motions to intervene would not serve any appropriate purpose under the circumstances, we find and conclude that all pending motions to intervene should, in the exercise of our discretion, be denied.

## VI.

■ Much of what has been thus far said is directly related to the determination of the ultimate question presented in this proceeding, namely, whether under all of the circumstances, the entry of the proposed consent decree as a Final Judgment would be in the public interest.

That portion of § 2(e) of the Antitrust Procedures and Penalties Act which provides that "before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest" is, in our judgment, an accurate codification of existing case law. Our view is consistent with the following evaluation of § 2(e) as contained in Senate Report #93–298, which was quoted with approval in House Report No. 93–1463 (U.S.

---

filed in the Southern District of Texas that a settlement of that litigation has been agreed upon, conditioned only upon the entry of the proposed consent decree. Counsel for the Texas private plaintiffs accordingly urge that the public interest requires that the proposed consent decree be approved forthwith.

That circumstance is, of course, unique in regard to the massive private litigation involved in JMPL Docket No. 83. For it is reasonably certain that most, if not all, of the private antitrust cases, excepting only those filed in the Southern District of Texas, will be tried rather than settled. Counsel for the numerous parties involved have permitted several logical times for the commencement of settlement negotiations to pass without notice. We have no reason to believe that a different course of action in regard to settlement will be followed in the future.

14. BNA Antitr. & Trade Reg.Rep., Mar. 21, 1967, at X–1, X–3; cited in Note Private Participation in Department of Justice Antitrust Proceedings, 39 U.Chi.L.Rev. 143, 151, n. 35 (1971).

Code Cong. and Admin.News 1974, 93rd Cong. 2nd Sess., pp. 6538–39:

The Committee recognizes that the court must have broad discretion to accommodate a balancing of interests. On the one hand, the court must obtain the necessary information to make its determination that the proposed consent decree is in the public interest. On the other hand, it must preserve the consent decree as a viable settlement option. It is not the intent of the Committee to compel a hearing or trial on the public interest issue. It is anticipated that the trial judge will adduce the necessary information through the least complicated and least time-consuming means possible. Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, this is the approach that should be utilized. Only where it is imperative that the court should resort to calling witnesses for the purpose of eliciting additional facts should it do so.

Nor is Section 2(e) intended to force the government to go to trial for the benefit of potential private plaintiffs. The primary focus of the Department's enforcement policy should be to obtain a judgment—either litigated or consensual—which protects the public by insuring healthy competition in the future. The Committee believes that in the majority of instances the interests of private litigants can be accommodated without the risk, delay and expense of the government going to trial. For example, the court can condition approval of the consent decree on the Antitrust Division's making available information and evidence obtained by the government to potential, private plaintiffs which will assist in the effective prosecution of their claims.

The various filings made by the government pursuant to the procedures directed in this case, and particularly the detailed response of the United States filed October 11, 1974 have afforded this Court the detailed type of information contemplated by the competitive impact statement of the new Act. Our study of the economic analysis of the AMPI monopoly prepared by Eisenstat, Masson and Roddy has fully acquainted the Court with the government's economic rationale.

The proposed consent judgment, the relief to be thereby obtained, and the anticipated effect of the consent judgment on competition has been more than adequately explained. The Court is fully familiar with the remedies available to private plaintiffs because of its pretrial supervision of JMPL Docket No. 83. Parties to that litigation who have stated the view that more stringent relief should have been provided in the consent decree are in no way foreclosed from urging that view in the private litigation. We are satisfied that the government actually considered and evaluated all of the various alternatives which the various persons have suggested and, in connection with most, ruled out the various alternatives recommended by third persons during the course of negotiations for reasons which have been adequately stated and explained.[15]

We have considered the competitve impact of the proposed consent decree, including but not limited to the government's determination that dissolution or divestiture is not required to restore competition and its conclusion that such divestiture would not be in the public interest. We find and conclude that the determination made by the government is well within the discretionary power of the Attorney General under existing law.

We have fully considered the impact of the entry of the proposed consent decree upon the public generally, and its impact upon third party plaintiffs

---

15. A good example of that process is illustrated by ARSPC's position in regard to Paragraph X of the proposed consent decree.

See pages 105, et seq. of the transcript of proceedings for November 15, 1974.

in private antitrust litigation. We find and conclude that the public generally and the private plaintiffs would be benefited by the entry of the proposed consent decree and that it would not be in the public interest to reject the proposed consent decree and thereby force the parties to trial.

While we believe the provisions for enforcement and modification are consistent with existing law, and well within the discretion vested in the Attorney General, we shall enter a supplemental order in that regard for reasons to be stated in the next part of this opinion.

## VII.

■■■■ The transcripts of the proceedings held in September and November, 1974, reflect this Court's concern with the problem of enforcement of antitrust consent decrees. During the course of those proceedings we made reference to Posner, A Statistical Study of Antitrust Enforcement, 13 J.Law & Econ. 365 (1970) and to Schuwerk, Private Participation in Justice Antitrust Proceedings, 39 Univ. of Chicago L.Rev. 143 (1971).[16]

A great deal of attention has been directed to the fact that somewhere between 70 and 80% of all civil antitrust complaints filed by the Department of Justice are terminated by consent decrees. Very little legislative or judicial attention, however, has been focused on the question of whether and how consent decrees have been enforced.

We have noted above that any changes in the manner in which consent decrees

are secretly negotiated must be made by the executive or legislative branches of the government. We are convinced, however, that particular aspects which relate to enforcement of a consent decree may be improved by judicial action. We are of the opinion that many persons who may be affected by a consent decree simply do not possess and are not furnished any information in regard to the manner in which alleged violations of a final judgment entered upon a proposed consent decree are to be brought before the Court for appropriate judicial enforcement proceedings.

The Supplemental Order establishing enforcement and modification procedures is entered with the hope that public information concerning a clear definition of applicable and available procedures for enforcement and modification of the final judgment entered in this case will improve the administration of justice in regard to the enforcement of the final judgments obtained by way of consent decrees.

For the reasons stated, it is

Ordered (1) that the pending motions to intervene should be and the same are hereby denied. It is further

Ordered (2) that the proposed consent decree attached to the stipulation filed August 13, 1974 should be and the same is hereby approved. It is further

Ordered (3) that the agreed orders presented to the Court on February 24, 1975 and March 6, 1975 in which Paragraph IX and V of the proposed consent

16. Specific reference was made to that portion of footnote 78 of Schuwerk's work which stated that "While the power of a court to punish consent decree violations through contempt proceedings is unquestioned, this power has seldom been utilized. There are three interlocking reasons for this. First, the Division practically never initiates contempt proceedings. Professor Posner reports that since the inception of the antitrust laws, the Government has instituted criminal contempt proceedings on only twenty-two occasions and has been successful in only twelve of these instances. Posner, supra, note 1, at 387

(Table 16). Professor Goldberg, writing in 1962, could find only thirty-nine instances of contempt proceedings brought in connection with antitrust consent decrees since 1890. M. Goldberg, supra, note 2, at 66. Another commentator could discover only three such efforts in the period from 1960 to 1969. Note, supra, note 36, at 1344. Thus, at most a total of forty-two attempts to punish decree violations through contempt proceedings have been made in approximately eighty years. [39 Univ. of Chicago L.Rev. Fall 1971, p. 161]

decree were modified and in which the scope of final judgment was further defined should be and the same hereby are approved. It is further

Ordered (4) that the Final Judgment appended hereto as Appendix B, which substitutes and adds the paragraphs included in the agreed orders described in the preceding order, should be approved and entered by the Clerk as the Final Judgment in this case. It is further

Ordered (5) that the Supplemental Order, appended hereto as Appendix C, establishing enforcement and modification procedures in regard to the Final Judgment should be and the same is hereby approved and ordered entered by the Clerk.

## APPENDIX A

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I | Purpose of the Proposed Decree | P. 2 |
| II | Dissolution or Divestiture as Relief in This Case is Not in the Public Interest | P. 4 |
| | A. Dissolution or Divestiture is Not Required to Restore Competition | P. 5 |
| | B. Dissolution or Divestiture by AMPI Would not Be in the Public Interest | P. 9 |
| | 1. The Transition Period | P. 9 |
| | 2. Competition would lead to the Most Reliable Restructuring of the Cooperative | P. 11 |
| III | Milk Marketing | P. 13 |
| IV | Responses to Third Persons' Comments Relating to Specific Decree Provisions | P. 19 |
| | A. Preamble | P. 19 |
| | B. Paragraph III | P. 21 |
| | C. Paragraphs IV(a) and IV(b) | P. 22 |
| | 1. Non-Commingling of Member and Non-Member Milk | P. 22 |
| | 2. AMPI's Right to Talk to Milk Haulers | P. 25 |
| | D. Paragraph IV(c) | P. 26 |
| | E. Paragraphs IV(e) and IV(f) | P. 28 |
| | F. Paragraph IV(g) | P. 32 |
| | G. Paragraph IV(h) | P. 34 |
| | H. Paragraph IV(k) | P. 35 |
| | 1. Common Marketing Agreements | P. 36 |
| | 2. Classified Pricing | P. 37 |
| | I. Paragraph IV(1) | P. 39 |
| | 1. Sub-Paragraph IV(1)(3) | P. 42 |
| | 2. Sub-Paragraph IV(1)(7) | P. 43 |
| | 3. Sub-Paragraph IV(1)(8) | P. 44 |
| | 4. Proviso to Paragraph IV(1) | P. 47 |
| | a. Price Differences Related to Costs | P. 48 |
| | b. Meeting a Lower Price of a Competitor | P. 48 |
| | J. Paragraphs IV(m) and (n) | P. 50 |
| | K. Paragraph IV(p) | P. 53 |
| | L. Paragraph IV(q) | P. 56 |
| | M. Paragraph IV(r) | P. 62 |
| | N. Paragraphs V and VI | P. 66 |
| | O. Paragraph VII | P. 68 |

APPENDIX A—Continued

TABLE OF CONTENTS—Continued

P. Paragraph VIII P. 73
Q. Paragraph IX P. 74
R. Paragraph X P. 77
S. Paragraph XI P. 86
T. Paragraph XIII P. 87
U. Paragraph XIV P. 88
 1. Reporting Requirements P. 90
 2. Private Enforcement of Proposed Decree P. 90
V. Paragraph XV P. 92
V Subjects not addressed by the Proposed Decree P. 93
 A. AMPI's Lawsuits P. 93
 B. AMPI's Relations with Associated Milk Dealers,
 Inc. P. 94
 C. Manufacturing Plant Payments · P. 94
 D. Injunction Against Fixing, Maintaining or Stabi-
 lizing Prices P. 96
VI Conclusion P. 97

## SPECIFIC RESPONSES TO ISSUES
## RAISED BY PARTICULAR
## THIRD PARTIES

| | |
|---|---|
| ARSPC | pp. 77–86 |
| Bartlett | pp. 88–92 |
| Beatrice | pp. 32–3; 41; 44–7; 50–2; 77–86; 96–7 |
| Bowman Farm | pp. 3; 37–8; 47–9; 53 |
| Ertel | pp. 21; 26–8; 28–30; 33; 56–62; 86–7; 92–3 |
| Farmers Dairies | pp. 34–5; 35–7; 50–2 |
| Farmers Union | pp. 22–5; 39–41; 42–3; 47–9; 68–73; 87–8; 88–92 |
| Hilbers | pp. 3; 53–6; 56–62; 62–5; 66–8 |
| Illinois | pp. 37–8; 47–8; 77–86; 94, 94–6 |
| Lamers and Utshig Dairies | pp. 53–6; 66–8; 73–4 |
| MAP | pp. 28–30; 34–5; 50–2; 56–62; 62–5; 66–8; 68–73; 86–7; 88–92 |
| NAMMR | pp. 22–5; 26–8; 34–5; 35–7; 37–8; 44–7; 50–2; 56–62; 62–5; 68–73; 74–6 |
| NFO | pp. 22–5; 25–6; 26–8; 30, 32–3; 42, 43–4; 47; 50–2; 53–6; 56–62; 62–65; 68–73; 88–92; 93 |
| Oberweis | pp. 22–5; 42–3; 53–4 |
| Page | pp. 50–2 |
| Schepps | pp. 33–4; 34–5; 54; 56–62; 62–65; 73–4; 88–92 |
| Sentry | pp. 19–20; 21; 31; 37–8; 39–41; 54; 77–86; 86–7; 88–92; 94 |

## APPENDIX B

### FINAL JUDGMENT

Plaintiff, United States of America, having filed its Complaint herein on February 1, 1972, and the parties hereto, by their respective attorneys, having consented to the making and entry of this Final Judgment, prior to the taking of any testimony, without trial or adjudication of any issue of fact or law herein, and without admission by either party in respect to any issue:

Now, therefore, prior to the taking of any testimony, before any adjudication of any issue of law or fact herein, and upon consent of the parties hereto, it is hereby

Ordered, Adjudged and Decreed as follows:

#### I

This Court has jurisdiction over the subject matter of this action, and of the parties hereto. The complaint states claims upon which relief may be granted under Sections 1 and 2 of the Act of Congress of July 2, 1890, as amended (15 U.S.C. §§ 1 and 2), commonly known as the Sherman Act.

#### II

As used in this Final Judgment:

(a) "Base" means the volume of milk assigned by defendant to certain member-producers for which such member-producer receives a price greater than the price received for milk marketed by such member-producer in excess of his assigned base;

(b) "Committed supply" means a supply of milk which defendant commits itself to deliver to a processor for a period in excess of one month;

(c) "Cooperative" means a person which meets the requirements of 7 U.S.C. § 291;

(d) "Cost" means the fully allocated costs as determined on the basis of generally accepted accounting practices consistently applied;

(e) "Direct shipped milk" means milk which is shipped direct from the farm at which it is produced to the processor;

(f) "Federal Milk Marketing Order" means a marketing agreement or order, and applicable regulations and rules of practice and procedure, relating to the handling of milk and adopted pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. § 601 et seq.);

(g) "Fluid milk" means pasteurized milk sold for human consumption in fluid form;

(h) "Former member-producer" means a nonmember-producer who once belonged to defendant but has lawfully terminated any membership or marketing agreement or contract with defendant;

(i) "Member-producer" means a producer belonging to defendant;

(j) "Milk" means raw milk produced by cows prior to pasteurization;

(k) "Milk hauler" means a person, not an employee of defendant, who owns or operates trucks which transport milk;

(l) "Milk products" means products manufactured from milk, such as butter, ice cream, cheese, and powdered milk;

(m) "Nonmember-producer" means a producer not belonging to defendant or any cooperative of producers not belonging to defendant;

(n) "Person" means any corporation, partnership, association, individual, cooperative, or other business or legal entity;

(o) "Plant" means the land, buildings, facilities, and equipment constituting a single operating unit or establishment in which milk or milk products are received, trans-

ferred, reloaded, processed, or manufactured;

(p) "Processor" means a person engaged in the business of purchasing milk and processing, bottling, or packaging fluid milk or milk products or manufacturing milk products;

(q) "Producer" means any person engaged in the production of Grade A milk; and

(r) "Southern Region" means the following geographic area:

Texas, Oklahoma, Arkansas; Campbell County, Tennessee and the area in Tennessee west of and including Henry, Carroll, Henderson and Hardin Counties; the area in Kentucky south or west of and including Ballard, Graves, and Calloway Counties; the area in New Mexico east of and including San Juan, McKinley, Valencia, Socorro, Sierra, and Dona Ana Counties; the area in Kansas west of and including Marshall, Pottawatomie, Geary, Morris, Chase, Coffey, Anderson, and Linn Counties; La Plata and Montezuma Counties in Colorado; De Soto County in Louisiana; Gage, Jefferson, Johnson, Pawnee, and Thayer Counties in Nebraska; the area in Mississippi north of and including DeSoto, Tate, Panola, Lafayette, Pontotoc, Lee and Tawamba Counties; and Bates, Butler, Howell, Jasper, McDonald, Newton, Stoddard, Taney, Vernon, Cass, Cedar, Barry, Christian, Ripley, New Madrid, Dade, Stone, Douglas, Oregon, Dunklin, St. Clair, Lawrence, Ozark, and Shannon Counties in Missouri.

### III

The provisions of this Final Judgment applicable to the defendant shall also apply to each of its directors, officers, agents, employees, subsidiaries, successors, assigns and their subsidiaries, and, in addition, to all persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

### IV

The defendant is hereby enjoined and restrained from:

(a) Entering into or enforcing any contract, agreement, or understanding with any milk hauler which requires that such milk hauler transport milk for a member-producer only, but defendant may require that a milk hauler not commingle member-producer milk with nonmember-producer milk unless such requirement would be inconsistent with the provisions of Section VI of this Final Judgment;

(b) Using threats, coercion, or undue influence to induce any milk hauler to refuse or threaten to refuse to haul milk for any nonmember-producer, or to induce any processor to refuse to deal with any milk hauler, but defendant may require that a milk hauler not commingle member-producer milk with nonmember-producer milk unless such requirement would be inconsistent with the provisions of Section VI of this Final Judgment;

(c) Purchasing or acquiring control of any milk hauler or of any hauling equipment of any milk hauler who, at the time of the purchase or acquisition of control, is hauling any milk of any nonmember-producer, unless defendant insures that facilities for shipping milk to the plant to which milk of said nonmember-producer is customarily delivered at the time of said purchase or acquisition of control are available to said nonmember-producer on comparable terms and conditions;

(d) Using threats, coercion, or undue influence to induce any processor to give to defendant preferred access

to unloading or testing facilities of said processor;

(e) Entering into or enforcing any contract, agreement, or understanding with any processor which binds such processor to purchase a committed supply of of milk from defendant for a period in excess of one (1) year or where the effect of entering into such contract(s), agreement(s) or understanding(s) may be to substantially lessen competition or tend to create a monopoly;

(f) Requiring any processor, as a condition of receiving any milk from defendant, to enter into any contract, agreement, or understanding for a committed supply of milk;

(g) Interfering or attempting to interfere with the exercise of the right of any processor to buy milk from a nonmember-producer at whatever prices, terms, or conditions said processor may chose, except that nothing herein shall limit defendant's rights under the Agricultural Fair Practices Act, 7 U.S.C. § 2301 et seq.;

(h) Requiring or attempting to require any processor or nonmember-producer to use services supplied by defendant, except that defendant may offer services to any processor or nonmember-producer at the cost of providing such services to member-producers;

(i) Requiring or attempting to require any processor, as a condition to the sale or delivery by defendant of any milk to said processor, to deliver to defendant anything of value based on milk sold to said processor by any nonmember-producer;

(j) Requiring or attempting to require any processor to purchase milk for delivery to one plant as a condition to the sale and delivery of milk to any other plant of such processor;

(k) Entering into or enforcing any contract, agreement, or understanding with any person, or aiding or causing others to enter into or enforce any contract, agreement, or understanding with any person, which has the purpose or effect of limiting said person's right to sell or dispose of milk wherever, to whomever, pursuant to whatever prices, terms, or conditions said person chooses to sell or dispose of such milk, provided that nothing herein shall prohibit defendant from selling milk on a classified price basis according to use or from entering into a common marketing agreement with other persons as authorized or permitted under 7 U.S.C. § 291 unless said common marketing agreement is prohibited by Section X of this Final Judgment;

(l) Discriminating or threatening to discriminate against any processor (i) who purchases or proposes to purchase milk from any person other than defendant for any or all of said processor's plants, or (ii) who resells or delivers or proposes to resell or deliver milk to any other processor, in any way, including but not limited to the following:

(1) refusing, limiting or reducing or threatening to refuse, limit, or reduce the sale or delivery of milk to said processor;

(2) refusing or threatening to refuse to sell a committed supply of milk to said processor;

(3) charging said processor a higher unit price for milk delivered to a plant of said processor than defendant charges for milk delivered to a plant of any competitor of said processor located in the same Federal Milk Marketing Order area or, if no Order exists, in the same geographic area, for milk sold on the same basis for similar use;

(4) engaging in less reliable or otherwise less favorable delivery practices for milk delivered to said processor than defendant furnishes to any

competitor of said processor for milk delivered to a plant of said competitor operated in either the same Federal Milk Marketing Order area or, if no Order exists, in the same geographic area;

(5) delivering a lower or less desirable quality of milk to said processor than defendant delivers to a plant of any competitor of said processor operated in either the same Federal Milk Marketing Order area or, if no Order exists, in the same geographic area;

(6) refusing to provide any service, discount or subsidy for milk delivered to a plant of any processor on the same terms and conditions as defendant offers for milk delivered to a plant of any competitor of said processor operated in either the same Federal Milk Marketing Order area or, if no Order exists, in the same geographic area;

(7) failing to offer to compensate said processor for any service performed, such as field services, on the same terms and conditions on which defendant compensates any competitor of said processor operating plants in either the same Federal Milk Marketing Order area or, if no Order exists, in the same geographic area;

(8) requiring said processor to account for its purchases of milk from defendant at any plant in any calendar month on a classified price basis in any manner which results in a larger percentage of the volume of milk supplied by defendant being purchased at the price defendant charges for the highest value utilization than is the percentage of the volume of milk supplied by all producers which is used by said processor in the highest value utilization at all plants receiving milk regulated under the same Federal Milk Marketing Order and owned or operated by said processor in the calendar month;

provided that nothing in this paragraph IV(1) shall prevent defendant from (i) charging said processors different prices for milk based upon differing methods of handling or delivering milk, if (a) said differences in price are reasonably related to differences in defendant's cost; and (b) said differences in price are not charged for the purpose of inducing any processor to cease, limit, reduce, or not make purchases from nonmember-producers; (ii) charging processors different prices for milk based on its use; or (iii) meeting lower prices of a competitor of defendant;

(m) Directly or indirectly offering to sell fluid milk or milk products to any customer of any person who sells fluid milk or milk products processed from milk produced by any nonmember-producer at prices lower than prices at which defendant offers to sell fluid milk or milk products to a similarly situated competitor of said customer;

(n) Directly or indirectly selectively soliciting any customer of any processor who sells fluid milk or milk products processed from milk produced by a nonmember-producer;

(o) Using threats, coercion, or undue influence to induce any producer to join or refrain from terminating its membership in defendant or to deliver its milk to defendant;

(p) Entering into any membership or marketing agreement with any member-producer which binds such member-producer to deliver milk to defendant for a term in excess of one (1) year, except any such contract

may provide for automatic renewal for succeeding periods of one (1) year, if either party does not give notice of termination at least thirty (30) days prior to the termination date of such contract, and provided that defendant will promptly provide any member-producer, who so requests, with written notice of the termination date of his contract and the dates on which he can effectively give notice of termination of said contract;

(q) Compelling or attempting to compel any member-producer to enter into any contract, agreement, or understanding which restricts the right of said member-producer to sell any milk to any processor after said member-producer has lawfully terminated his membership and marketing agreement or contract with defendant; except that defendant may require any member-producer who sells or otherwise transfers base to enter into a contract, agreement, or understanding with the transferee of base which provides that, for a period of two (2) years from the date of said transfer, said transferor will not compete with defendant for fluid milk sales in the Southern Region;

(r) Qualifying milk under any Federal Milk Marketing Order with a purpose of forcing, coercing, or inducing nonmember-producers to join defendant or to cease selling milk in competition with defendant.

## V

Defendant is hereby ordered and directed for a period of three (3) years from the entry of the Final Judgment to notify each member-producer of the termination date of his membership or marketing agreement, and of the dates on which he can effectively give notice of termination of such agreement; said notice must be given to each member-producer by defendant annually not more than fifty-five (55) days or less than fifteen (15) days prior to the first day on which said member-producer can effectively terminate said membership or marketing agreement; the provisions of this Section V shall not apply to any member-producer whose membership or marketing agreement is for a term of one (1) month or less.

## VI

The defendant is hereby enjoined and restrained, for a period of three (3) years from the entry of this Final Judgment from refusing or threatening to refuse to deliver or to market the milk of any former member-producer on the same basis as it delivers or markets the milk of any member-producer whose milk is customarily delivered to the same plant to which the milk of said former member-producer's milk was customarily delivered at the time his membership or marketing agreement with defendant is terminated; the obligation of defendant to continue marketing the milk of any former member-producer shall be from the date defendant receives written notice of the termination of the membership or marketing agreement with defendant to the date at which said plant may terminate its contract with defendant or for four (4) months from the date of the termination of the membership or marketing agreement, whichever is longer.

## VII

The defendant is hereby enjoined and restrained for a period of five (5) years from the entry of this Final Judgment from refusing or threatening to refuse to receive milk produced by any producer on equivalent and non-discriminatory terms, within the limits permitted by 7 U.S.C. § 291, and §§ 1381 through 1388 of the Internal Revenue Code of 1954, as amended, and regulations issued pursuant thereto (or as the same may be amended from time to time), to the extent of the available capacity of any plant of defendant in excess of capacity needed for the handling of milk of member-producer; provided, however, that nothing in this Section VII shall require

defendant to pay any cooperative or processor delivering to defendant's plants (other than unregulated plants described in Section X of this Final Judgment) more than the value of the milk to said plant, said value to be determined by the current market price of the products manufactured at said plant, and the yields and the make allowances as used in the federal dairy price support program and announced for the market year.

## VIII

The defendant is hereby enjoined and restrained for a period of five (5) years from the entry of this Final Judgment, from exercising its right to vote on behalf of its members pursuant to the terms of 7 U.S.C. §§ 608c(9)(B), 608c (12) and 608c(16)(B), if the effect of such vote will be to terminate any existing Federal Milk Marketing Order.

## IX

The defendant is hereby enjoined and restrained, for a period of ten (10) years from the entry of this Final Judgment from purchasing, consolidating with, acquiring control of, or leasing any plant (except for renewal of an existing lease) without the prior written consent of the Department of Justice or the Court. At least forty-five (45) days in advance of the closing date of any transaction to purchase, consolidate with, acquire control of or lease any such plant, defendant shall supply plaintiff with complete details concerning the terms and conditions of the proposed transaction. Within thirty (30) days after its receipt of the above information plaintiff shall advise the defendant of any objection it may have to the consummation of the proposed transaction. If such an objection is made by plaintiff, then the proposed transaction shall not be consummated unless approved by the Court on the basis of a showing by defendant that the proposed transaction will not substantially lessen competition in any line of commerce, in any section of the country.

## X

The defendant is hereby enjoined and restrained, for a period of ten (10) years from the entry of this Final Judgment, from participating in any plan or program with any cooperative or with any organization whose members are cooperatives relating to the purchase or option to purchase milk from plants not regulated under any Federal Milk Marketing Order, or from any producer shipping milk to said plant, unless said plan or program provides:

(a) that any plant not regulated under any Federal Milk Marketing Order may enter into a contract, on a non-discriminatory basis, to grant an option to purchase milk pursuant to a plan or program to establish or maintain a reserve supply of milk if said plant meets similar standards of quantity and quality as are met by any plant under such a contract and said plant is in competition for the procurement of raw milk with any plant which is under contract to supply milk pursuant to such a plan or program;

(b) that there shall be no discrimination against any contracting plant which receives milk from non-member-producers;

(c) that any contracting plant shall be permitted to dispose of any milk for which a purchase option is not exercised at least 24 hours prior to the time the milk is picked up from the farm to whomever, wherever, and upon whatever terms and conditions it chooses; there shall be no discrimination against any plant which resells milk on which said option is not exercised;

(d) that any cooperative may participate in said plan or program on an equivalent and non-discriminatory basis;

(e) that any participating cooperative shall be permitted to resell milk obtained through such plan or pro-

gram to whomever, wherever, and on whatever terms and conditions it chooses;

(f) that no contract, agreement, or understanding entered into pursuant to such plan or program shall exceed a term of one (1) year;

(g) that said plan or program shall be used for the purpose of establishing and maintaining a reserve supply of milk to fulfill the requirements of participating cooperatives and for that purpose only;

(h) that in the event said plan or program is carried out through any organization all of whose members are cooperatives, persons receiving orders from participating cooperatives and directing the shipment of milk pursuant to such plan or program shall be independent of and shall not be employed by any participating plant or cooperative; and regardless of the form of said plan or program all reports of shipments of milk will not be made until the completion of the month, and shall be made at the same time to all cooperatives and plants participating in said agreements;

provided, however, the terms of this Section X shall not be applicable to any marketing agreement with the Secretary of Agriculture authorized by 7 U.S.C. § 601 et seq. relating to a reserve supply of milk in unregulated plants.

## XI

Within thirty (30) days after the entry of the Final Judgment, defendant is ordered and directed to withdraw from, and is enjoined and restrained from joining, contributing anything of value to, or from participating in, any organization or association which directly or indirectly engages in or enforces any act which the defendant is prohibited by this Final Judgment from engaging in, or enforcing, or which is contrary to or in-consistent with any provision of this Final Judgment.

## XII

(A) The defendant is ordered and directed within ninety (90) days from date of entry of this Final Judgment to amend its By-Laws, Rules, and Regulations by eliminating therefrom any provision which is contrary to or inconsistent with any provision of this Final Judgment.

(B) Upon amendment of its By-Laws, Rules, and Regulations as above said, defendant is thereafter enjoined and restrained from adopting, adhering to, enforcing, or claiming any rights under any By-Law, Rule, or Regulation which is contrary to or inconsistent with any of the provisions of this Final Judgment.

(C) The defendant is ordered to file with the plaintiff annually for a period of ten (10) years on the anniversary of the entry of this Final Judgment, a report setting forth the steps taken by the Board to advise its officers, directors, employees, members, and all appropriate committees of its and their obligations under the prohibitions placed upon them by this Final Judgment.

## XIII

(A) Defendant is ordered to mail or otherwise furnish within ninety (90) days after the date of entry of this Final Judgment a copy thereof to each of its members and employees, to each hauler transporting milk for defendant, to each processor purchasing milk from or selling milk to defendant or any organization for which defendant acts as marketing agent, and to the cooperative members, officers, and employees of Associated Reserve Standby Pool Cooperative, Central Milk Producers Cooperative, Central Milk Sales Agency, and within one hundred fifty (150) days from the aforesaid date of entry to file with the Clerk of this Court an affidavit setting forth the fact and manner of compliance with paragraph XIII.

(B) Defendant is further ordered and directed to mail or otherwise furnish a copy of this Final Judgment to its members once each year for four (4) additional years, and to furnish a copy of this Final Judgment to any person upon request.

### XIV

For the purpose of determining or securing compliance with this Final Judgment, and subject to any legally recognized privilege:

(a) Duly authorized representatives of the Department of Justice shall, upon written request of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant made to its principal office, be permitted (1) access, during the office hours of defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or in the control of defendant relating to any of the matters contained in this Final Judgment, and (2) subject to the reasonable convenience of defendant and without restraint or interference from defendant, to interview officers, or employees of defendant, each of whom may have counsel present, regarding any such matters.

(b) Defendant, upon such written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit such reports in writing to the Department of Justice with respect to matters contained in this Final Judgment, as may from time to time be requested.

No information obtained by the means provided in this paragraph XIV shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff, except in the course of legal proceedings to which the United States of America is party for the purpose of determining or securing compliance with this Final Judgment or as otherwise required by law.

### XV

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for further orders and direction as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions hereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

### XVI

In accordance with the agreement of the parties, the following agreed order is stated in this new paragraph which has been added to this Final Judgment as originally proposed:

Defendant is enjoined and restrained from accomplishing any reorganization or restructuring of defendant into separate regional or sectional cooperatives unless each such cooperative agrees in writing, filed with the plaintiff and the Court, to be bound by the terms of the Final Judgment in United States v. Associated Milk Producers, Inc., Civil Action No. 74 CV 80–W–1, entered this day.

### APPENDIX C

### SUPPLEMENTAL ORDER ESTABLISHING ENFORCEMENT AND MODIFICATION PROCEDURES IN REGARD TO FINAL JUDGMENT APPROVED APRIL 30, 1975

Paragraph XV of the Final Judgment entered on the proposed consent decree approved in the above-entitled cause on April 30, 1975, provides:

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for further orders and direction

as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions hereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

Pursuant to, and in the exercise of the general jurisdiction of this Court and in the exercise of the particular jurisdiction retained by Paragraph XV of the Final Judgment, this Court, on its own motion, finds and concludes that the public interest requires that appropriate procedures for enforcement and modification of that decree be established and provided by formal order of court.

Therefore, and in order to implement the provisions of Paragraph XV of the Final Judgment, it is hereby

Ordered, Adjudged, and Decreed That the following procedures shall be followed in connection with future proceedings which may seek the enforcement and modification of said Final Judgment:

## I. PROCEDURE WHERE ENFORCEMENT IS SOUGHT BY THE UNITED STATES

Should the United States determine that defendant is not complying with any provision of the Final Judgment, it shall proceed in accordance with law as provided in Rule 42(b) of the Rules of Criminal Procedure.

## II. PROCEDURES WHERE ENFORCEMENT IS SOUGHT INDEPENDENT OF THE UNITED STATES

A. Should any person other than the United States believe that defendant is not complying with provisions of the Final Judgment, such person shall, before making or filing any application for this Court to exercise its independent power and jurisdiction to enforce the Final Judgment on its own motion, take the following steps:

1. Such person shall prepare and serve on the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice an appropriate written request which shall formally pray that the United States file an appropriate petition for enforcement pursuant to paragraph I above.

2. Said request shall state with particularity: (a) the interest of the person allegedly aggrieved by the defendant's alleged noncompliance with the Final Judgment; (b) the circumstances concerning defendant's alleged noncompliance; (c) the names of persons who allegedly have personal knowledge of those circumstances; and (d) the relief which such person believes the United States should seek in a petition for enforcement which such person believes the United States should file under the circumstances.

B. Such request shall be supported by an appropriate written memorandum which shall include, as separately numbered exhibits, supporting affidavits of persons with personal knowledge of the alleged circumstances and verified copies of any documentary evidence which the allegedly aggrieved person believes may be relevant and material under the circumstances.

C. Such supporting memorandum shall include as an appendix a copy of a petition for enforcement which the allegedly aggrieved person believes should be filed by the United States.

D. At the time the allegedly aggrieved person serves his request and supporting memorandum on the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, he shall simultaneously transmit information copies of said request and supporting memoranda to the Clerk of this Court and to the judge having jurisdiction over the above-entitled cause.

E. The Assistant Attorney General in charge of the Antitrust Division of the Department of Justice shall, within twenty (20) days (or within such additional time as the Court may grant)

after the receipt of a request from an allegedly aggrieved person, reply to such person in writing. Such reply shall state with particularity: (a) what investigation or other action, if any, will be taken by the Antitrust Division in regard to the request; (b) when such action will be taken; and (c) the reasons supporting the decision of the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice.

F. Information copies of the reply of the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice shall be simultaneously transmitted to the Clerk of this Court and to the judge having jurisdiction over the above entitled cause.

G. In the event the United States as a result of the request, or on its own motion, takes action deemed appropriate by the allegedly aggrieved person, no further proceedings will be necessary under the circumstances.

H. In the event, however, that the United States does not take action deemed to be appropriate by the allegedly aggrieved person, then in that event, and only in that event, such person may so advise the Court in writing and suggest that the Court give appropriate consideration to whether it should, under the circumstances, exercise its independent power and jurisdiction to direct enforcement proceedings on its own motion.

I. The Court will consider the written suggestion of the allegedly aggrieved person, will review the written request and supporting memorandum presented to the Assistant Attorney General, together with the reply of the Assistant Attorney General, and will thereafter determine what, if any, further appropriate proceedings should be directed under the circumstances.

III. PROCEDURES FOR MODIFICATION OF THE FINAL JUDGMENT

Motions for modification of the Final Judgment may be filed only by a party to the case. Any motion for modification shall be filed in accordance with the Rules of Civil Procedure and the Local Rules of this Court.

In the event such a motion is filed, the Court will direct appropriate proceedings under which persons who claim to be aggrieved will be afforded appropriate notice of the proceeding and will be afforded an appropriate opportunity to seek full or limited participation in the proceedings.