**UNITED STATES of America, Plaintiff,**

v.

**NATIONAL BROADCASTING COMPANY, INC., Defendant.**

**Civ. No. 74–3601–RJK.**

United States District Court,
C. D. California.

Jan. 26, 1978.

Bernard M. Hollander, Bernard J. O'Reilly, Kevin R. Sullivan, Barry J. Kaplan, George W. Selby, Washington, D. C., Polly L. Frenkel, Dept. of Justice Antitrust Div., Los Angeles, Cal., for plaintiff.

Schnader, Harrison, Segal & Lewis, Bernard G. Segal, Harvey Levin, Jerome J. Shestack, Peter S. Greenberg, Philadelphia, Pa., Gibson, Dunn & Crutcher, Samuel O. Pruitt, Jr., Don J. Belcher, John J. Hanson, J. Edd Stepp, Jr., Los Angeles, Cal., for defendant.

## MEMORANDUM OF DECISION RE CONSENT DECREE

KELLEHER, District Judge.

### I. Introduction

The government's complaint against National Broadcasting Company ("NBC"),

alleging violations of the Sherman Act, was filed on December 10, 1974. NBC answered the complaint on December 30, 1974, and the action thereafter proceeded through various stages of discovery and pretrial motions. On November 17, 1976, presumably upon the completion of extensive negotiations, the government and NBC submitted to the Court a proposed final judgment by consent which, upon approval by the Court, resolves all claims between the parties and concludes the litigation.

Because this is a civil antitrust lawsuit brought by the United States, the terms and conditions of the *Antitrust Procedures and Penalties Act* ("APPA") apply. See 15 U.S.C. § 16 (1977 Supp.). APPA provides that the government must publish any proposed consent judgment and receive public comments thereto and that before the Court may approve such a judgment, *it must determine that such judgment is in the public interest.* The Act authorizes, but does not require, the Court to adopt certain procedures to aid in its determination of the public interest question.

The proposed consent judgment and the competitive impact statement ("CIS") were published in the Federal Register on November 24, 1976; additionally, summaries of the judgment were published in local newspapers in the District of Columbia and Los Angeles, California. Thereafter the Court and the government received numerous comments on the judgment, and in due course the government responded to these comments, publishing all relevant documents in the Federal Register on May 16, 1977. Based on the comments received, certain changes were made in the proposed judgment, and on May 4, 1977, NBC and the government submitted to the Court an amended proposed final judgment. Now that the requirements of the APPA concerning publication and consideration of public comments have been satisfied, the matter is ripe for a judicial determination of whether the proposed judgment is in the public interest.

## II. *Background and Complaint*

This litigation was commenced by the government in April of 1972 when it filed separate but similar complaints against ABC, CBS and NBC. Upon a motion by defendants to dismiss the actions on the ground that there had been noncompliance by the plaintiff with certain orders of Court, the Court, on November 13, 1974, dismissed the original actions without prejudice. Thereafter, on December 10, 1974, the government filed new complaints, again alleging the same violations of the Sherman Act as contained in the original complaint. These new complaints survived a repeated defense motion to dismiss on grounds of unconstitutional prosecutorial purpose and the case proceeded through discovery in pretrial proceedings. The Court also denied three other significant motions made on behalf of the defendants: (1) a motion for summary judgment on the Sherman Act claims; (2) a motion to dismiss on the ground of exclusive jurisdiction in the Federal Communications Commission; and (3) a motion to dismiss without prejudice or to stay on the ground of primary jurisdiction in the Federal Communications Commission.

The complaint alleges violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1970), in connection with NBC's practices and activities in producing, procuring, and distributing prime-time television programs. In general, the complaint challenges the control exerted by NBC over the production, acquisition and exhibition of television programs shown during the prime-time hours. To comprehend the allegations of the complaint, it is necessary to understand, at least on a rudimentary basis, the manner in which NBC procures and exhibits its prime-time television programming.

Of approximately 700 television stations in the United States which broadcast commercial television programs, about 200 stations have affiliation agreements with NBC. During prime-time evening hours, these stations depend upon NBC for virtually all of their television programs. In

addition to the affiliated stations, NBC owns and operates stations in five of the nation's leading television markets—New York, Los Angeles, Chicago, Washington, and Cleveland. The government contends that with the power derived from its control over the owned and affiliated stations, NBC has monopolized the trade in commerce of production of prime-time television programming shown on the NBC network, has attempted to monopolize such market, and has entered into combinations and agreements in restraint of trade, particularly as it contracts for the purchase of programs produced by independent producers.

Most of the programs shown on the NBC network have been produced either by NBC itself or by independent producers who sell rights, including the right of exhibition, to NBC. One of the practices challenged by the government in this action is NBC's custom of purchasing from independent program producers various rights in addition to the right of exhibition. The value of a television program is not exhausted by its first network showing. After the completion of its run on network television, a program may be distributed to individual television stations for non-network broadcast. It also may be distributed to foreign television stations for broadcast while appearing at the same time over a domestic television network. This distribution to individual stations for non-network broadcasting is known as syndication. The government contends that for a substantial number of programs produced by independent producers, NBC acquires the syndication rights and thereby derives a substantial portion of the ultimate profits produced by a television program. The government contends that NBC is able to purchase these valuable subsidiary rights from independent program producers because of its control of access to the NBC television network, and since CBS and ABC pursue the same practice, independent program producers must deal on network terms or not deal at all.

The complaint also focuses on the relationship between NBC and advertisers. At one time in the television industry, it was not uncommon for an advertiser to purchase air time from the networks and to purchase television programs from outside program suppliers for broadcast during such air time. The advertisers thus constituted a substantial market for the income of program producers and served as buyers in competition with the networks. The complaint charges that NBC now will not sell air time to advertisers for the exhibition of a television program, but will sell only time for commercial messages, broadcast in conjunction with a program already selected by NBC. It is claimed this practice has removed advertisers as a competitive force in the purchase and sale of television programming and has left the three networks as the primary market for outside program suppliers.

It is charged that in furtherance of this monopoly over the market of television programming shown on its network, NBC has engaged in the following acts:

(a) excluded television programs in which NBC had no ownership interest from broadcast on the network during prime-time hours;

(b) compelled outside program suppliers to grant to it financial interest in television programs produced by them;

(c) refused to offer program time to advertisers and other outside program suppliers;

(d) controlled the prices paid by NBC for the exhibition rights to motion picture feature films distributed by non-network distributors; and

(e) as a producer of programs itself, obtained a competitive advantage over other producers and distributors of television programs and motion picture feature films.

It is claimed the effects resulting from these acts are:

(a) ownership and control of television programs shown during prime evening hours on the television network are concentrated in NBC;

(b) competition in the production, distribution and sale of television programs has been unreasonably restrained;

(c) competition in the sale of television programs to NBC by outside program suppliers has been unreasonably restrained; and

(d) the viewing public has been deprived of the benefits of free and open competition in the broadcasting of television entertainment programs.

The complaint prays for the following relief:

(1) that NBC be prohibited from obtaining any interest except for the first-run right of exhibition in television programs produced by others;

(2) that NBC be prohibited from engaging in syndication of any television programs;

(3) that NBC be prohibited from transmitting over its television network any television program, including feature films, produced by NBC or any other commercial television network, and from allowing any NBC-produced program from being transmitted over CBS or ABC networks; and

(4) that NBC be prohibited from using its control of access to broadcasting time on the NBC network to foreclose competition or obtain an unfair competitive advantage in any other field.

In summary, the complaint focuses on three basic aspects of business within the NBC television network: (a) the terms and conditions on which NBC purchases television programs and feature length films from independent producers and suppliers; (b) the terms of access to the NBC television network; and (c) NBC's production of its own television programming and films.

## III. Terms of the Consent Judgment

Discussion of the terms of the proposed judgment and the relief provided therein follows the organization of the judgment itself. The judgment addresses various practices of NBC, and review of the judgment by subject matter will facilitate later consideration of objections lodged against the judgment.

### (a) Financial Interests and Syndication

Section IV of the proposed judgment prohibits NBC from acquiring syndication and other distribution or profit shares in television programs produced by others. Thus, in negotiating the purchase of television programs from independent producers and suppliers, NBC would be permitted to acquire only the right of first-run exhibition and certain rights incident to the licensing and use of programs. The network would be prohibited from acquiring "financial interests" in a television program produced by an outside source which would earn revenues and profits for NBC beyond the network run of the program. Syndication is the most significant of these secondary rights, and NBC would be prohibited from acquiring any domestic syndication rights. The judgment permits foreign syndication of NBC-produced programs and certain foreign programs.

The relief provided for in this section of the judgment parallels the restrictions placed on all three television networks by the FCC's financial interest and syndication rules.

### (b) Internal Production of Programs

Section V of the judgment places restrictions on NBC's ability to exhibit on the NBC network television programs which it has produced. For a period of ten years, NBC is restrained from broadcasting on the NBC network more than two and one-half hours per week in prime-time hours, eight hours per week in daytime hours, and eleven hours per week in fringe-hours television programs which it has produced itself. Thus, for those hours set aside for non-NBC-produced programming, NBC would be required to obtain the programs from independent program suppliers. This provision does not take effect until similar relief is obtained against CBS and ABC in the ongoing litigation.

### (c) Terms and Conditions of Program Purchases

A substantial portion of the programs exhibited on the NBC network are purchas-

es from independent program suppliers. Section VI of the judgment imposes on NBC various restrictions on the terms and conditions it may seek in contracting with independent program suppliers for the purchase of television programming.

### (d) Subsidiary Rights

NBC is prohibited from purchasing or offering to purchase exhibition rights to an independent program supplier's program on the condition that the supplier would grant NBC any right or interest other than those incident to network licensing and use of the program. This prohibition reinforces the restriction on NBC in acquiring syndication and other financial interest rights in a television program.

### (e) NBC Production Facilities

For a period of fifteen years, NBC is prohibited from purchasing or offering to purchase from an independent program supplier the right of exhibition of a television program on the condition that such supplier produces the program, in whole or in part, by utilizing NBC's production facilities.

### (f) Facilities, Contracts

For a period of fifteen years, NBC is prohibited from contracting with an independent program supplier for the use of NBC production facilities for a period in excess of the time required to produce episodes for one broadcast year, provided however that the parties at the end of each year may renew the contract for one additional year. This provision precludes NBC from requiring independent program producers to enter into long-term contracts for the use of NBC's production facilities. This provision will not take effect until similar relief is obtained against CBS and ABC.

### (g) Reciprocal Dealing

To preclude NBC from avoiding the limitation on internal production, this section would prohibit NBC from engaging in reciprocal dealing with CBS or ABC, by prohibiting NBC from purchasing exhibition rights of any television programs produced by CBS or ABC on the condition that CBS or ABC purchase similar rights from NBC. This restriction applies for a period of ten years.

### (h) Exclusive Rights

This provision of the judgment imposes ceilings on certain exclusive rights that NBC may acquire from independent program suppliers in connection with the purchase of exhibition rights for a television program.

### (i) Options

This provision is designed to restrict NBC's ability to obtain exclusive rights to a program series developed and produced by an independent supplier for as long as seven years. Since in most cases contracts between NBC and independent suppliers for the production and television exhibition of programs are entered into before the program has been developed, under its present practice NBC can obtain exclusive exhibition rights to a program series for up to seven years at a point when the independent producer can merely speculate as to the program's popularity and value. This provision prohibits NBC from including in its contracts with producers exclusive yearly options for more than four years, plus a single year's extension if the contract is renegotiated. If NBC wished to extend its exclusive network exhibition right beyond this initial five-year period, it would have to negotiate a new contract at or near the end of the first contract. With respect to acquiring first negotiation or first refusal rights for new agreements with the supplier, the permissible first refusal rights which NBC could acquire may not prohibit the program supplier from entering into a new contract at the end of any contract term with someone else if the terms were equal to or better than the supplier's last offer to NBC. This provision takes effect only if similar relief is obtained against CBS and ABC.

## (j) *Exclusive Exhibition Rights*

This provision places limits on the exclusive exhibition rights NBC may acquire from independent program suppliers. First, with respect to prime-time use of a program, NBC may not acquire an exclusive right of exhibition beyond the term of the contract by which NBC acquired the right to network exhibition. Second, NBC may not obtain more than four years of exclusivity as against non-prime-time stripping. "Stripping" is the broadcast of a program series more than once a week after the series has been exhibited on the network. The judgment provides, however, that if NBC has agreed to order episodes of a program for the first year of broadcast as an NBC prime-time program series, it may negotiate for and acquire rights for stripping and once-weekly exhibition to be utilized after the above periods of exclusivity. Third, for all other broadcast use of a program, NBC may not acquire the right of exclusive exhibition for more than three years. NBC remains free to acquire exclusive exhibition rights to a series for the broadcast year for which such series is ordered.

## (k) *Exclusivity in Feature Films*

This section limits the exclusivity rights NBC may acquire in theatrical feature films. It bars altogether the acquisition of exclusive exhibition rights as against the exhibition of feature films by theatrical and non-theatrical direct projection, on closed circuit television in non-residential hotels, motels, bars, restaurants, and hospitals, or on passenger-carrying vehicles. Additionally, NBC is barred from acquiring exclusive exhibition rights as against use of feature films in discs, cartridges or cassettes.

The original proposed judgment filed with the Court in November of 1976 contained a provision restricting the exclusive rights NBC may acquire as to pay cable television. The provision would have limited NBC to exclusivity for a period of 24 months for two runs of a feature film and an additional 12 months for each subsequent run. In recognition of public comments critical of this provision as an establishment of an industry standard which is anticompetitive, the parties determined to, and did, delete this provision in its entirety. Thus, the amended judgment contains no provision on exclusivity in pay cable television. *See infra.*

## (1) *Options on Pilots*

This provision places restrictions on NBC's ability to obtain a first-year pick-up option from an independent program supplier for a program designated by NBC and the supplier as a "pilot program." If NBC has not advanced the supplier any part of the cost of the pilot development, it is prohibited from acquiring a pick-up option exercisable more than one year after delivery to NBC of the pilot. The provision places a further limitation on the exercise of these options. Program selections for each network's new fall season are generally made in the preceding spring, and for the so-called second season replacement, selections are made in the preceding fall. In an attempt to make available those series that have not been selected by NBC for television exhibition, the judgment requires NBC to release its options to 65 percent of such pilots upon the payment to NBC of all its unrecouped costs for the development of such pilots. This provision therefore makes it possible for independent suppliers who have sold pilots to NBC subject to an exclusive one-year option to be relieved of that option so that, upon the pilot being rejected by NBC, the supplier may offer it to other networks or television stations. This provision would not take effect until similar relief is obtained against CBS and ABC.

## (m) *Exclusive Rights to Spinoffs*

It is not uncommon for one television series to generate other television programs based on characters of the first; these evolved series are referred to as "spinoffs." This provision of the judgment restricts the rights NBC may acquire in spinoffs. Where the spinoff involves a non-continuing character—that is, a character who appears in no more than 25 percent of the

original episodes during the 12 months prior to the time the independent supplier offers exhibition rights for the spinoff—NBC is prohibited from obtaining a contractual option in excess of first negotiation and a limited first refusal right. The first refusal rights permitted cannot prohibit the program supplier from entering into a new contract for the exhibition of the spinoff with someone else if the terms are equal to or better than the supplier's last offer to NBC. This provision would not take effect until similar relief is obtained against CBS and ABC.

### (n) Use of Repeats

In addition to the right of exhibition, a television program series also involves repeat rights, by which the network may exhibit the program again after the original showing. This provision limits NBC's use of repeats acquired as part of network exhibition to the same year as that in which the initial episodes of the series are broadcast. There are three express exceptions to this prohibition: (1) as to three episodes of each series per year, NBC may rerun them in any subsequent year; (2) once NBC has ordered program series episodes for the first year of broadcast, it may purchase rights to additional repeats for subsequent years without limitation; and thus the general prohibition would be totally voided once NBC has agreed to order episodes of the program series for the first year of broadcast on the NBC network; (3) the limitation on the use of repeats does not apply to (i) made-for-television and theatrical feature films, (ii) specials, and (iii) cartoons or other children's programs. This provision would not take effect until similar relief is obtained against CBS and ABC.

The remaining sections of the judgment concern miscellaneous matters. Section VIII sets forth certain areas of NBC activity which are not disturbed by the judgment. Section IX provides that if a non-appealable judgment is entered dismissing the actions against either CBS or ABC or decreeing injunctive relief different from that provided in this judgment, NBC may seek and obtain whatever relief is necessary to prevent it from being placed at a competitive disadvantage with respect to CBS or ABC. The government acknowledges that a provision of this type is unusual in an antitrust judgment, but justifies it on the ground of the unique nature of the television industry. Finally, Section X of the judgment requires NBC to furnish copies of the judgment to all its officers, directors, and appropriate employees and agents, and for ten years to furnish copies to each independent program supplier known to have offered programs to NBC within the preceding five years.

### IV. Objections to the Consent Judgment

After the original proposed judgment was published in the Federal Register in November of 1976, the government and the Court received numerous comments from interested parties discussing the merits of the proposed judgment. Pursuant to the terms of the APPA, a period of at least ninety days was left open for the submission of public comments. The vast majority of the comments received were in opposition to some or all of the terms of the judgment. This fact probably carries no independent significance since few interested parties would take the time and amass the resources necessary to file favorable comments. The negative comments, however, did direct the Court's attention to possible shortcomings in the proposed judgment, and for that reason were given serious consideration before final approval was given. The interested parties submitting comments on the proposed judgment fall into four general categories: (1) independent program suppliers; (2) CBS and ABC; (3) public interest groups; and (4) members of the pay cable television industry.

### A. Objections of Independent Program Suppliers

The following independent television producers and suppliers submitted comments in opposition to the proposed judgment: United Artists Corporation, Metro-Goldwyn-Mayer, Inc., Columbia Pictures Industry,

Inc., Goodson-Todman Productions, Paramount Pictures Corporation, Twentieth Century Fox Film Corporation, Warner Brothers, Inc., Universal City Studios, Inc., Tandem Productions, Inc., Enterprises, Inc., Lorimar Productions, Inc., and the Caucus of Producers, Writers and Directors, T.A.T. Communications Company, Bud Yorkin Productions, MTM Enterprises, MTM Productions, Inc., and Charles Fries Productions, Inc.

The consensual position taken by the independent program producers and suppliers (hereinafter "independent suppliers") is that the proposed judgment does not go far enough in curtailing and restricting the alleged anticompetitive practices of NBC. The independent suppliers, of course, are the persons and organizations which contract with NBC for the purchase and sale of television programming and as purchasers are interested in obtaining the most favorable terms possible. As the original holders of many of the rights brought into issue by the judgment, these parties have a substantial and obvious financial interest in reduction of the negotiating power of NBC.

The general position taken by the independent suppliers is that the proposed judgment does not require NBC to change in any significant part any of the anticompetitive practices that have placed independent suppliers at a distinct disadvantage. These parties contend that the proposed judgment provides no meaningful relief from the alleged antitrust violations outlined in the government's complaint and urge the Court to decline to give its approval to the judgment.

The following are the specific objections the independent suppliers lodge against the terms of the proposed judgment:

1. *NBC Internal Production*

The independent suppliers object to any internal production of television programming by NBC and object that the limitations placed on NBC's ability to produce programs exhibited on the NBC network is insignificant. It is an uncontested fact that in this respect pursuant to the terms of the judgment NBC will be entitled to more hours of prime-time internally-produced television programming than NBC is in fact presently generating. It appears that now the only prime-time series owned by NBC consumes one hour of time per week. Under the judgment, NBC will be permitted to expand its internal production up to two and a half hours of prime-time viewing per week. The independent suppliers claim that NBC may threaten expansion of internal production in order to obtain more favorable terms in the purchase of programs from the independent suppliers. In response, the government argues that a ceiling on NBC's internal production will prevent it from substantially increasing its internal production and thereby excluding independent program suppliers; the result, in the government's mind, is increased competition in the television program production market.

The major film studios also argue that within the limitation of two and a half hours of prime-time per week, NBC is free to produce internally feature length motion pictures for television exhibition, thereby depreciating the market for films produced by the major studios. The major studios argue that unless NBC's ability to make feature films is restricted, it will continue to use the threat of internal production to keep the price it pays outside feature film suppliers at an artificially low level. These parties, therefore, urge a total ban on NBC internal production.

The position of the independent suppliers is fairly clear—if NBC is removed entirely from the market of television program production, there should be a greater demand for programming supplied by the independent producers and correspondingly less leverage on the part of NBC to extract favorable terms.

The Court has considered whether the presence of NBC as a producer of prime-time television programming will enhance or restrict competition in the television programming production market. The judgment permits limited participation by NBC despite the independent program suppliers'

contention that NBC should be excluded altogether as a producer of television programming.

### 2. *Options*

The terms of the judgment concerning the permissible options NBC may acquire to a program series is a major source of opposition by the independent suppliers. When a network orders a "pilot," it obtains an option for other episodes for the first year of telecast, plus options to order episodes for succeeding years. These options may be purchased when the "pilot" is only in development and thus the price for the option years are established without any true indication of the program's eventual popularity or worth. The judgment limits NBC's acquisition of options to four years, with the right to obtain one additional year if the agreement with the independent supplier is renegotiated.

The independent suppliers complain that this provision does not go far enough in curtailing NBC's use of its negotiating power to extract long term options from the producers. Once again, the issue is whether the relief provided by the judgment [Section VI(E)(i)] is "substantial," as maintained by the government, or merely cosmetic, as maintained by the independent suppliers. The government originally sought a two year limit on the options which NBC could acquire, but concedes that it was forced to compromise and accept a longer period. One factual dispute arising from these conflicting positions concerns NBC's practice in acquiring options. The government contends that the networks presently obtain initial program options of six or seven years; it consequently characterizes a limitation of four years as "substantial" relief. The independent suppliers, on the other hand, contend that the present industry practice is to obtain options for five years only, and therefore argue that a limitation of four years is not at all substantial. The suppliers also complain that NBC's right to renegotiate for a fifth option year serves no purpose in promoting competition.

The judgment's limitation on options applies only to prime-time programming, prompting some independent suppliers to complain about the lack of any limitation on the option NBC may acquire as to non-prime-time programming. It is noted in this respect, however, that the government's inquiry into network practices originally focused only on prime-time programming.

### 3. *Exclusivity*

The independent suppliers complain that the various provisions of the judgment relating to the exclusive rights against other television uses which NBC may obtain provide no meaningful relief. The judgment permits NBC to acquire exclusive rights as against other prime-time use of a program series for the duration of the agreement between NBC and a program supplier. The independent suppliers complain that this provision precludes them from licensing older episodes for broadcast to independent stations in the early evening hours. Secondly, the judgment permits NBC to acquire at least four years of exclusivity as against non-prime-time stripping of a program series; the independent suppliers contend that since a producer must usually have at least four years of episodes of a program before stripping is possible, for all practical purposes, NBC will be able to acquire the same exclusive rights it presently acquires. Thirdly, the judgment permits NBC to obtain exclusive rights as against all other broadcast uses not in excess of three years; the suppliers argue that in the absence of any proof that prime-time ratings of new episodes are adversely affected by showings of older episodes in non-prime-time hours, there is no justification for precluding a program supplier for three years from making whatever use he can during non-prime-time for older episodes of a program. Finally, the suppliers complain that the provision of the judgment that permits NBC to acquire greater exclusive rights than outlined in the judgment if it has agreed to purchase episodes of a program for the first year of broadcast serves no

pro-competitive purpose and is without justification.

The limitations on the acquisition of exclusive rights imposed by the judgment is an attempt to even out the bargaining positions of NBC and its independent program suppliers. The government contends that the imposed limitations constitute substantial relief and will have a pro-competitive effect within the television programming market. On the other hand, the independent program suppliers maintain that the decree does not go far enough in restricting the rights which NBC may acquire and that in effect NBC has given up virtually nothing in agreeing to the proposed judgment.

### 4. Parallelism

Section VII of the judgment provides that certain key provisions will not take effect until similar relief is obtained against CBS and ABC. The independent suppliers argue that this provision guarantees that for the future the three networks will be able to offer suppliers of television programs virtually identical terms and conditions. The government's justification for this provision is that, in light of the unique nature of the television industry, NBC should not be placed at a competitive disadvantage with respect to the other television networks by virtue of its agreement to this proposed judgment.

The gist of the independent suppliers' opposition in this regard is that there is no price competition among the three networks and that this decree fails to alleviate that condition. The government's response is that it recognizes that each network has enormous market power not subject to meaningful competition from the other networks or from non-network stations. Its purpose in bringing these actions was to limit each network's use of its power in purchasing television entertainment programs; it is readily apparent from the face of the complaint and the terms of the consent judgment that the government did not intend directly to foster competition between NBC and CBS or ABC. The proposed judgment must be viewed in light of

the government's limited objectives. Apparently the government by the three pending lawsuits chose not to challenge therein the oligopolistic structure of the television industry, but rather, recognizing the immense market power of each network, sought merely to limit the exercise of that individual power and create a situation in which independent program suppliers would be able to obtain more favorable terms than was heretofore possible.

### 5. Exclusive Use of Talent

The government has discovered that a new and growing trend among the networks is to acquire exclusive contracts with talent performers, producers, directors and writers, or to acquire exclusive exhibition rights to literary properties, and then to "lay off" the talent or the property on an independent producer. To "lay off" a talent or property is to assign the contractual rights therefor to an independent program producer in connection with a program production agreement. Once the program is produced, the talent or property reverts back to the network. In this way the network avoids labeling a program as an "in house" program, but still retains a large degree of control over it. If the network decides not to develop a series from a pilot or to cancel a program series that has been on the air, the independent producer is precluded from attempting to sell the program elsewhere since he cannot obtain either the talent or the literary property to make subsequent episodes of the program. The government also correctly notes that when a single network has an exclusive hold on talent or on a property, no other network can compete for the talent or property in question. Moreover, it seems that, all other things being equal, the network will attempt to fill its scarce air time first with talent and properties to which it holds exclusive contracts.

The independent suppliers oppose entry of the consent judgment on the ground, inter alia, that it does not provide any relief from NBC's practice of acquiring exclusive rights to talent or literary properties. The

government's response to such an objection is as follows:

"The government considered various ways of limiting NBC's use of these exclusive contracts in the proposed final judgment, but decided that a specific provision appeared unwarranted at this time. It was decided, therefore, that a satisfactory resolution of this problem was to agree with NBC that further relief under the judgment or by a new action could be sought, if it were later found that NBC had used exclusive contracts so as to impede competition."

By express stipulation, therefore, the parties have left open the question of future relief in regard to the network's practice of acquiring exclusive talent rights.

### B. Objections of CBS and ABC

Both CBS and ABC have lodged multi-front attacks on the proposed judgment and strenuously urge the Court to withhold its approval. Their objections are summarized below.

### 1. The Proposed Decree is Anticompetitive

CBS and ABC contend that rather than fostering competition in the television production market, the judgment will have a decidedly anticompetitive effect. They characterize the decree as one that will benefit a particular group of program producers by shielding them from the rigors of competition, but which makes the market in which such producers operate less competitive. In their view, the judgment protects competitors, not competition.

### (a) Limitation on NBC Production

ABC and CBS argue that Section V of the judgment, which limits the amount of television programming that may be produced by NBC, will restrict the supply of television programs without altering the demand therefor. They contend that the effect, therefore, will be to drive up the price of television programming. Moreover, the networks argue that with one less producer in the market of programming production,

competition among the independent producers will be relaxed. Notwithstanding the limited amount of internal production presently engaged in by NBC, ABC and CBS characterize their fellow network as a source of potential competition which serves as a substantial incentive to competition by others operating in the market. ABC and CBS further note that a production limitation is particularly inappropriate in light of the shortage of theatrical feature films for television. If the shortage worsens as a result of the judgment, the networks claim that the only foreseeable result will be yet higher prices charged by the major film studios for feature films.

### (b) Restrictions on Terms of Trade

ABC and CBS complain that those provisions of the judgment which restrict the rights NBC may acquire from program producers are anticompetitive and will serve to reduce competition among television program producers and suppliers. Their rationale, supported by affidavits of an economist and a professor of law, is that restrictions on the rights NBC may acquire in addition to the right of exhibition will force independent producers to bear more of the risk of a program's failure. For example, the networks refer to the restriction on the renewal options which NBC can purchase, arguing that the restriction prevents producers from selling "up front" to NBC options for later years of a program, thereby preventing them from realizing at an early date the current value of those options. CBS and ABC further argue that by shifting the risk of failure, the proposed judgment will force out small independent producers and suppliers, who are not in a position to absorb their costs of production without realizing quickly the full exploitation value of the program series.

CBS and ABC correctly recognize that the judgment is not intended to enhance competition among the three television networks. They view the judgment as establishing a complex system of regulation over the contractual relationships between the networks and independent program suppli-

ers designed to afford the suppliers a fair price. To their mind, however, this is not the purpose of the Sherman Act, which is intended to protect competition rather than competitors, and should not be condoned by the Court. The government's response is that contrary to the assertions of the other networks, the judgment will enhance competition in the market of television program production by reducing the market power of NBC so that it is not as free to dictate the terms and conditions upon which it acquires rights in television programs.

2. *The Proposed Judgment Establishes a Regulatory Regime that Conflicts with the Regulatory Authority of the FCC*

The FCC has promulgated rules and regulations bearing upon certain matters that are the subject of this judgment. The Court has long recognized that there may be "a real and substantial problem" of accommodating antitrust relief with the FCC's regulatory scheme. It is no surprise that ABC and CBS now, again, argue that the relief provided by the judgment duplicates, overlaps and collides with the FCC's regulatory regime.

■ First, ABC and CBS argue that this Court will be placed in the position of overseeing a complex regulatory scheme resulting from the terms of the judgment. Of course, there is a duty upon a Court, once it has approved a consent judgment providing for injunctive relief, to oversee effectuation thereof. This is an unavoidable duty for courts handling large antitrust cases. While the degree of supervision required of a judgment is a significant factor to be considered, it alone should not bar relief where it is otherwise indicated.

In January of 1977 the FCC issued a notice of inquiry into the television industry, initiating proceedings in which many, if not all, of the matters here under consideration would be investigated. CBS and NBC contend that the regulatory scheme created by the judgment may conflict with the results of that inquiry. Since the FCC inquiry has only recently begun, and as of

this date has not resulted in any rules or regulations, one may only speculate as to the possibility of conflict between the terms of this judgment and any rules that may materialize from the FCC's investigation. The overlap and possible conflict between the relief provided by the judgment and the regulatory scheme that may result from the FCC's inquiry is one of the most serious issues attending the Court's consideration of the consent decree. Therefore, the exact scope of the FCC's investigation must be considered by the Court.

■ All parties agree that the FCC's recently initiated inquiry into television programming practices covers almost every issue brought into question by the judgment. While it is not certain that the FCC investigation will result in definite rules and regulations, there indeed is a substantial likelihood that the Commission will engage in further rule making once its investigation is completed. This Court previously has held that exclusive jurisdiction over the subject matter of the antitrust actions filed against the networks does not lie within the exclusive or primary jurisdiction of the FCC; there is, therefore, no legal impediment to this Court's decreeing appropriate antitrust relief. With respect to the issue of reconciliation of antitrust relief with the FCC's regulatory scheme, assuming this judgment is implemented prior to the conclusion of the FCC's investigation, the burden would fall on the Commission to formulate regulations not in conflict with outstanding judicial orders. While the Court is cognizant of the FCC investigation, and may even wish to take advantage of the expertise lent to that investigation by the FCC, the Court should not be deterred from ordering appropriate antitrust relief by the fact of the Commission's inquiry.

3. *The Proposed Judgment Undermines NBC's First Amendment Rights*

■ ABC and CBS assert, presumably on behalf of NBC, the position that the judgment undermines First Amendment values in restricting NBC from engaging in internal production programming. Aside from

the fact that CBS and ABC have no standing to assert constitutional rights of NBC, it may be observed that the judgment restricts NBC's participation in a commercial venture and in no way attempts to dictate the content of programs which may be exhibited on the NBC network. It is clear that the First Amendment does not shield NBC nor any other television network from the proscriptions of the Sherman Act.

## C. *Opposition of Pay Cable Television Industry*

The original proposed judgment submitted to the Court in November, 1976 contained a provision regarding the exclusive exhibition rights of feature length films which NBC may acquire as against pay cable television. Following the receipt and consideration of numerous comments from interested parties, the vast majority of which were in opposition to the pay cable provision, the government and NBC decided to delete from the judgment any relief whatsoever concerning exclusive rights as against pay cable television. Thus, the judgment does not address the issue of exclusivity as against pay cable television.

The original pay cable provision provided that NBC may acquire exclusive rights to the exhibition of a feature film as against pay cable television use of such film for a maximum period of 24 months for two showings, and an additional 12 months for each showing in addition to the two original showings. The public comment on this provision, submitted primarily by members of the pay cable television industry, argued that this provision would set an industry-wide standard and confer government blessing on a blatantly anticompetitive practice. While the government's original intention in proposing the pay cable limitation was to establish a ceiling on permissible exclusive rights, upon the review of the public comments, it appeared to the government that the actual effect of the provision would be to establish a controlling standard in the television industry. Consequently, the pay cable provision was deleted from the judgment.

Notwithstanding the deletion of the provision, the pay cable parties maintain that the decree should not be approved by the Court so long as it omits to provide substantial relief against NBC's practice of obtaining exclusive rights as against pay cable television stations. The pay cable parties thus urge the government to pursue affirmative relief in the form of severe or total restrictions on NBC's power to acquire exclusive rights as against the pay cable industry. The government has not officially responded to this position. After amending the judgment so as to delete the objectionable pay cable provision, the government did not issue a new competitive impact statement discussing the ramifications of the deletion of the pay cable provision. It is contended by some parties that a new competitive impact statement is required under the APPA and that the decree cannot be given final approval until an amended competitive impact statement is submitted by the government. The APPA does not expressly require the submission of multiple competitive impact statements, and the contention of the pay cable parties raises a question of first impression. While republication and initiation of a new period of receiving public comments apparently is not required by the APPA, arguably it is in keeping in spirit with the ACT to require the government to respond to the position of the pay cable parties that entry of the judgment by the Court is not in the public interest in the absence of affirmative relief with respect to exclusivity and pay cable television.

A well-recognized principle of law bearing on the issue raised by the position of the pay cable parties is that the government need not in a single action rectify all injustices uncovered by its investigation and discovery. With respect to the pay cable industry, it appears that, upon determining that it could not arrive upon a stipulated agreement providing for substantial relief, the government chose to defer to a later time actions which could result in the type of corrective action advocated by the pay cable parties. The issue for the Court's determination is whether, in the absence of

any restriction on the right of NBC to acquire exclusive rights as against pay cable television, the judgment, which otherwise may be justified, fails to satisfy the public interest.

### D. Objections of Public Interest Groups

The only so-called public interest group to file comments with respect to the judgment was the Institute for Public Interest Representation of Georgetown University Law School. The gist of their comments is that the competitive impact statement ("CIS") submitted by the government in support of the judgment is insufficient as a matter of law in light of the requirements of the APPA. The same objection also has been raised by ABC and CBS. In the case of ABC and CBS, objections to the form and content of the CIS are in actuality objections to the form and content of the terms of the judgment. For example, CBS complains that the CIS fails to explain how the judgment will enhance competition in the television program production market, whereas in fact the substance of CBS's objection is that in its view the judgment is anti- rather than pro-competitive.

The Institute for Public Interest Representation cites various perceived shortcomings in the CIS but fails to make a conclusive showing that the statement fails to satisfy the specific requirements of the APPA. The government has responded to the Institute's comments and is prepared to defend the CIS as legally sufficient.

All of the foregoing issues and conflicting conditions relating thereto have been considered by the Court; each contention has been weighed on the scale of whether it tilts for or against "the public interest"; each has been considered in light of the special interest of the respective proponents thereof. None of the proponents strikes the Court as an advocate for "the public interest." Although each proponent has been of assistance to the Court in its consideration of "the public interest," none has offered a solution that meets "the public interest." The government in its role as protector of "the public interest" appears to have accomplished an acceptable result.

The government, having expressed its proper prosecutorial prerogative by the filing of the instant action (together with the actions against CBS and ABC), issue was long ago joined; all parties in each case proceeded with the utmost vigor to indulge the adversary process; and now the adversary parties (NBC and the government) have arrived at a compromise settlement of their litigated differences.

That the law looks with favor upon compromise settlements generally is indisputable; that it looks with particular favor upon such settlements as emerge from vigorous head-knocking on the part of capable and energetic adversaries whose prolonged stir and contest has occurred at arm's length is, if anything, even more obvious. Embodying this policy and directly applicable to Court approval of a consent decree in civil public antitrust suits is the oft-quoted dictum of the Supreme Court in *Sam Fox Publishing Co. v. U. S.*, 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961). There, in denying intervention as of right during proceedings to modify a consent decree to members of a music association which had entered into such a decree, the Court observed:

> [S]ound policy would strongly lead us to decline appellants' invitation to assess the wisdom of the Government's judgment in negotiating and accepting the 1960 consent decree, at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting.

*Id.* at 689, 81 S.Ct. at 1313. *See U. S. v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *U. S. v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975).

This standard continues to apply with equal force even after enactment of the Antitrust Procedures and Penalties Act ("APPA"), Pub.L. 93–528, § 2, 88 Stat. 1706 (December 21, 1974), 15 U.S.C. § 16 (1977 Supp.), *U. S. v. Associated Milk Producers, Inc.*, 394 F.Supp. 29, 41 (W.D.Mo.1975), aff'd, 534 F.2d 113, 117 (8th Cir. 1976). The

district court in *AMPI*, after noting that pre-APPA criticism of the consent decree procedures focused on the failure of the Justice Department and the courts to give substantial consideration to the views of third parties, the secrecy of the negotiation process itself, and the minimal judicial scrutiny of the proposed decree, 394 F.Supp. at 42, quoting Note, "The *ITT* Dividend: Reform of Department of Justice Consent Decree Procedures," 73 Col.L.Rev. 594, 597 (1973), observed:

Courts, of course, cannot do anything about "the secrecy of the negotiation process itself." Indeed, a court's power to do very much about the terms of a particular decree, even after it has given the decree maximum, rather that minimum, judicial scrutiny, is a decidedly limited power. *See United States v. Ward Baking Co.*, 376 U.S. 327, 84 S.Ct. 763, 11 L.Ed.2d 743 (1963); [*City of Burbank v. Gen. Electric Co.*, 329 F.2d 825, 831 (9th Cir. 1964).] Power to reform the procedures under which consent decrees are actually negotiated is vested in the executive and legislative branches, not the judicial. And, *if the Congress wants the judicial branch to have more power than that implicit in a threat of total rejection of a proposed decree, such power must be authorized by legislation which is considerably broader in scope than that vested by the newly enacted Antitrust Procedures and Penalties Act or by existing law.*

Courts have long had power, however, . . . to devise and direct appropriate procedures to enable the Department of Justice and the court to have the benefit of the views of third parties. Courts which accept Brandeis' idea that "[s]unlight is said to be the best of disinfectants," L. Brandeis, *Other People's Money*, 92 (1914 ed.), have exercised that power under the circumstances of a particular case. That objective may be effectively attained by procedures which do not include the complications which may result from the granting of a formal motion to intervene as a party.

*Id.* at 42–43. [Emphasis supplied.] Adverting specifically to the impact of APPA on the procedures designed to meet these objectives, the Court noted:

We agree, of course, with the statement in the Note [73 Col.L.Rev. 594] that "Most of the procedural devices contained in the Tunney bill have long been available to the courts to investigate decrees" and that "*the specific guidelines for judicial investigation* [now incorporated in the Antitrust Procedures and Penalties Act], all discretionary with the court, *are hardly revolutionary.*"

*Id.* at 42 n. 11 [Emphasis supplied.] On Appeal the Eighth Circuit, addressing its remarks to an issue analogous to that which this Court has been directing its energies, held that:

It is axiomatic that the Attorney General must retain considerable discretion in controlling government litigation and in determining what is in the public interest. Thus, in our view, the intervention standard remains that which was stated in *Sam Fox* : "[B]ad faith or malfeasance on the part of the Government" in negotiating and accepting a consent decree must be shown before intervention will be allowed. 366 U.S. at 689, 81 S.Ct. at 1313, 6 L.Ed.2d at 609.

534 F.2d at 117.

One of the most thoughtful and thorough treatments to thus far emerge in the post-APPA era with regard to the proper posture and approach of a court faced with approval of a consent decree was offered by Senior Circuit Judge Aldrich in *U. S. v. Gillette Co.*, 406 F.Supp. 713 (D.Mass.1975):

Taken literally, the burden [that APPA places upon a court reviewing a proposed consent decree] is impossible. The legislative history shows clearly that Congress did not intend the court's action to be merely pro forma, or to be limited to what appears on the surface. Nor can one overlook the circumstances under which the act was passed, indicating Congress' desire to impose a check not only on the government's expertise—or at the least, its exercise of it—but even on its good faith. *See* 120 Cong.Rec. S 20862

(daily ed. Dec. 9, 1974); BNA Antitrust & Trade Reg. Report No. 630, at A–15 (1973). At the same time, both by the statute's listing various alternatives short of a comprehensive examination, 15 U.S.C. § 16(f), and by the announced expectancy of both congressional committees, the court is adjured to adopt "the least complicated and least time-consuming means possible." *See* S.Rep.No.93–298, 93d Cong., 1st Sess. 6 (1973); H.Rep. No.93–1463, 93d Cong. 2d Sess. 8 (1974), 1974 U.S.Code Cong. & Admin.News 6539. *In this situation the court cannot provide the best of all possible worlds. Just as the parties are compromising, so in its process of weighing the public interest, must the court.*

This seems neither improper nor unwise. Fear has been expressed that the act's "elaborate procedure . . . will prove counterproductive and may, indeed, undermine [by placing too great obstacles on the consent process] effective enforcement of our antitrust laws." Handler, Antitrust—Myth & Reality in an Inflationary Era, 50 N.Y.U.L.Rev. 211, 243 (1975). Courts' involvement in preventing potential harm to competition can become excessive. *Cf. Emhart Corp. v. USM Corp.*, 1 Cir. 1975, 527 F.2d 177. I agree that *in terms of the important role of the consent decree in antitrust procedure, too much tillage can destroy the garden.*

Nor do I think Congress had, in fact, any contrary intention. The Senate Judiciary Committee reported that a high percentage of government antitrust actions are settled prior to trial, and recognized that the consent decree process was a "legitimate and integral part of antitrust enforcement." S.Rep., ante, at 3, 5. "Obviously, the consent decree is of crucial importance as an enforcement tool, since it permits the allocation of resources elsewhere." S.Rep. at 5. "[T]he Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool." S.Rep. at 7. "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong.Rec. 24598 (1973). *Id.* at 715. [Emphasis supplied.]

Turning to the precise standard by which a court is to determine whether or not a particular consent decree is in "the public interest," a matter concerning which the Act, 15 U.S.C. § 16(e), provides no apparent guidance and for which there is a paucity of clarificatory case law, Judge Aldrich concluded:

It is not the court's duty to determine whether this is the best possible settlement that could have been obtained if, say, the government had bargained a little harder. The court is not settling the case. It is determining whether the settlement achieved is within the reaches of public interest. *Basically I must look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass.*

*Id.* at 716. [Emphasis supplied.]

Having adhered to Judge Aldrich's sound advice, and having found that the proposed consent decree is in the public interest, the Court notes certain aspects that this case shares with *AMPI* and *Gillette*, the two most significant and searching decisions interpreting APPA.

First, as in *AMPI*, all interested persons have been afforded every right and opportunity fully and fairly to state their views and comments that formal intervention would have granted, and consequently, as did the court in *AMPI*, 394 F.Supp. at 44, this Court has denied motions to intervene. Second, as in *AMPI*, this Court is "satisfied that [it has had] much more data before [it] for consideration than that contemplated by [APPA]", 394 F.Supp. at 35, and consequently that, heeding Judge Aldrich's comment respecting Congress' intent that courts adopt "the least complicated and least time-consuming means possible," 406 F.Supp. at 715, "a plenary evidentiary hearing [pursuant to 15 U.S.C. § 16(f)(1) and (3)] is neither necessary nor appropriate under the circumstances." 394 F.Supp. at 35. The legislative history clearly and expressly establishes that "[i]t [was] not the intent of

the committee to compel a hearing or trial on the public interest issue." S.Rep.No.93–298, quoted with approval in H.Rep.No.93–1463 (1974 U.S.Code Cong. & Admin.News at 6538–39), quoted in 394 F.Supp. at 45. Third, as in *AMPI*, this has not been a case "where the government has requested broad relief at the outset, represented to the courts that nothing less would do, and then abruptly 'knuckled under' . . .", 534 F.2d at 118. In *AMPI*, as in *NBC*, "it was merely certain practices, and not the concert of action *per se* which the government sought to end," *id.*; and in evaluating a proposed consent decree, one highly significant factor is the degree to which the proposed decree advances and is consistent with the government's original prayer for relief, *see U. S. v. Automobile Mfrs. Ass'n*, 307 F.Supp. 617, 621 (C.D.Cal.1969), *aff'd per curiam sub. nom. City of New York v. U. S.*, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970).

Finally, the Court derives additional confidence from the fact that this is not a case wherein objectors speak with one voice. In the deluge of comments which the proposed decree has prompted, the Court has found that while some commentators (e. g., independent program producers and suppliers) have objected generally on the grounds that the proposed decree does not go far enough in eliminating the anticompetitive practices of which the government complains, *see supra* at 16–23, others (e. g., the other networks) have urged upon the Court the position that the proposed decree, far from ameliorating the allegedly anticompetitive practices asserted by the government to exist in prime-time broadcasting, would in fact exacerbate the situation and actually restrain otherwise healthy competition, *see supra* at 23–26. In this regard, this Court thus is not faced with the unified opposition to entry of the consent decree with which Judge Aldrich was confronted in *Gillette*, and which prompted him to remark that the court need not "require that defendant do everything that opposers may wish. [Defendant] could always do something more. A point, however, comes where an agreement ceases to be a compromise." 406 F.Supp. at 716.

From the outset of this action, as in the predecessor actions, this defendant and the other network defendants in the companion cases, sought to persuade the Court to dismiss, abstain or otherwise disregard the lawsuits. On three or more separate occasions, the Court was fairly inundated by defendants with briefs, memoranda, and other legal documents urging upon the Court that it was either without jurisdiction to determine, or should leave to another body to determine, or, before deciding, should await the advisory benefits of another body's determination. In each instance the Court was strongly impressed with the desirability of leaving for resolution the complex and technical issues here involved to an administrative body specially equipped, trained, and oriented in the field of communications, particularly with respect to "prime-time" programming in television. If it had been properly within the province of this Court to determine what the law ought to be rather than to accept what it is, this case and others would have been dismissed or deferred temporarily or indefinitely.

■ The entities objecting to the consent judgment on a jurisdictional basis, primary or otherwise, misconceive the function of this forum. The law is clear that the government is at liberty to pursue its remedy here in an action sounding in the federal antitrust laws even though the ills they attack are, or likely are, remediable by the administrative action of the Federal Communications Commission. *See United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). The later case of *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) offered some hope to those who favored the theory of predominance or exclusivity of jurisdiction within the administrative body having regulatory power over the alleged Sherman Act violations. But that later decision leaves the network defendants with hope for the future but no solace here. The case is distinguished from ours; in *National Association of Securities Dealers*, the Supreme Court found the *express* authorization under the Investment Compa-

ny Act (15 U.S.C. § 80–1 et seq.) of the activities challenged as violative of the antitrust law. The Court found the express authorization "repugnant" to the antitrust laws and hence expressly authorized acts were deemed immune from antitrust attack. This is not our situation. Ours is at most a situation in which the government is free to invoke either or both the administrative or judicial forum jurisdiction for correction of evils condemned under the Communications Act and the antitrust laws. *RCA* makes it clear that the Communications Act does not inhibit enforcement by the government of antitrust laws in broadcasting matters merely because the FCC acted in regard to the challenged conduct.

In our case the FCC has not acted; it has asserted merely its intention to act. But that has been going on for years with no results. It was this Court's view from the outset that the government could have, and perhaps preferably should have, bestirred the FCC to action rather than institute the current antitrust actions against the networks. However, it is outside the province of this Court to dictate to the government a prosecutorial course of conduct. It is the Court's province merely to determine if the course adopted by the government is permissible in law. It is; see *U. S. v. American Telephone and Telegraph Co.*, 427 F.Supp. 57 (D.D.C.1976), petition for writ of certiorari denied and portion of Feb. 3, 1977 order staying further proceedings in district court vacated (Per curiam order in No. 77–1009, D.C.Cir., May 26, 1977), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977).

The relief provided by the judgment is consistent with the government's general theory of liability as manifested in its complaint. The actions against the three television networks never were instituted for the purpose of breaking up their oligopolistic control of the television industry or for the purpose of fostering competition among the three of them. The government's case has been predicated on the recognition that each of the networks possesses enormous market power, and that this power is being used to place independent program producers and suppliers, those who sell television programming to NBC, at a distinct competitive disadvantage. From the outset the government has sought to improve the lot of the independent producers and suppliers and enhance competition in the buying and selling of television programming by imposing on the networks restrictions on the terms and conditions governing their contracts with the independent suppliers. Thus, the government has recognized that because of the enormous market power possessed by NBC, it has been able to deal with the independent suppliers on terms highly favorable to the network and highly unfavorable to the suppliers. The remedy the proposed judgment seeks to accomplish is to limit the benefits and financial rewards that otherwise would flow from an exercise of this power. Accordingly, the Court has found that the consent judgment, on balance, advances and is in "the public interest," and so concluding, has approved said judgment.